THOMAS W. BOWE & others *vs.* SECRETARY OF THE COMMONWEALTH

(and five companion cases [1]).

Suffolk.    September 12, 1946. — September 20, 1946.

Present: FIELD, C.J., LUMMUS, QUA, RONAN, & WILKINS, JJ.

*Constitutional Law*, Initiative, Separation of powers of government, Assertion of constitutional rights, Freedom of elections, Freedom of the press, Freedom of speech, Peaceable assembly. *Labor and Labor Union*. *Statute*, Amendment. *Elections*. *Laches*. *Attorney General*. *Jurisdiction*, Justiciable question. *Words*, "Description," "The press."

An amendment by the initiators of a law proposed by the Initiative, merely striking out an erroneous statutory reference in the proposed law and duly certified by the Attorney General, all in accordance with art. 48 of the Amendments to the Constitution, The Initiative, V, § 2, was "perfecting in its nature" and did not materially change the substance of the proposed law; and thereafter the proposed law must be dealt with as changed by the amendment.

A law proposed by the Initiative as an amendment of a certain section of the General Laws by striking out the first sentence thereof and substituting therefor a new first sentence whose language ignored a previous amendment of that section by the General Court whereby a certain provision had been transferred from the second sentence to the first sentence, if enacted, would not include the provision so transferred.

There is no statutory provision for a review of the checking by registrars under G. L. (Ter. Ed.) c. 53, § 7, as amended by St. 1943, c. 334, § 3; § 22A, as amended by St. 1943, c. 51, of the names of voters signing a petition in initiative proceedings seeking enactment of a proposed law, except the limited review for forgery or fraud provided by said § 22A; the Attorney General and the Secretary of the Commonwealth must accept the certification of the registrars when it is presented to them.

---

[1] The companion cases are by the same petitioners, one against the Secretary of the Commonwealth, two against the Attorney General, and two against the registrars of voters of Everett.

Laches barred a certiorari proceeding commenced on August 7, 1946, to
quash a certification by registrars of voters, that a signature "Jos.
Anthony Mavilio" was that of a voter qualified to sign an initiative
petition, on the ground that the signer was registered as Joseph A.
Mavilio and that he therefore did not sign "with his name as regis-
tered" as required by G. L. (Ter. Ed.) c. 53, § 7, as amended by St.
1943, c. 334, § 3; § 22A, as amended by St. 1943, c. 51, where it ap-
peared that, although the petitioners for certiorari may have had no
actual knowledge of such variance between signature and registration,
there was complete failure on their part to embrace an ample oppor-
tunity to ascertain the fact of such variance in the period after the
filing of the initiative petition in September of 1945 and while further
initiative proceedings were going forward through the procuring of
additional signatures and in the Legislature.

The mere fact that the Attorney General was active as a proponent and
advocate of certain laws proposed under the Initiative did not dis-
qualify him from performing his constitutional duties under art. 74
of the Amendments to the Constitution of the Commonwealth.

There is no provision by statute or otherwise that a law proposed by the
Initiative shall include a title, descriptive of it to any particular
degree or wholly accurate so far as the title is descriptive.

The provision of art. 74 of the Amendments to the Constitution of the
Commonwealth for "a fair, concise summary" of a proposed law by
the Attorney General was intended as a relaxation of the requirements
implicit in the provision for a "description" of the proposed law in
art. 48 of the Amendments.

A description by the Attorney General of a law proposed by the Initiative
complied with the requirement of art. 74 of the Amendments to the
Constitution of the Commonwealth that it be a "fair, concise sum-
mary" although in some small matters it lacked completeness.

The question, whether a law proposed under art. 48 of the Amendments
to the Constitution of the Commonwealth, The Initiative, if enacted,
would violate the Federal Constitution, or some part of the Constitu-
tion of the Commonwealth other than art. 48 or art. 74 of its Amend-
ments, was not open in a proceeding to prevent the law being placed
upon the ballot.

Restatement by LUMMUS, J., of the rationale of the power of courts, as
an exercise of a purely judicial function, to enforce the provisions of
the Massachusetts Constitution as against a conflicting Massachusetts
statute, and the provisions of the Federal Constitution, or of a Fed-
eral statute made pursuant thereto, as against a conflicting State
Constitution or statute.

Only when the impact of a statute upon particular individuals, who have
both the opportunity and the incentive to defend their rights by argu-
ment, and upon a set of definite facts established after genuine con-
troversy, has been shown, can a court decide the constitutionality of
the statute.   Per LUMMUS, J.

The question, raised by a petition for a writ of mandamus forbidding the
Secretary of the Commonwealth to submit to the people a certain law
proposed by the Initiative, whether the proposed law relates to
"Excluded Matters," is justiciable.

Neither a law proposed by the Initiative to amend G. L. (Ter. Ed.) c. 55, § 7, by adding, to the individuals and corporations thereby prohibited from making certain political contributions, labor unions and "any person acting in behalf thereof," nor a law so proposed to require labor unions to file with a public official certain organizational and financial statements and reports, would be inconsistent with freedom of elections and for that reason would be an "excluded" matter which under art. 48 of the Amendments to the Constitution, The Initiative, II, § 2, could not be the subject of an initiative petition.

A law proposed by the Initiative to amend G. L. (Ter. Ed.) c. 55, § 7, by adding, to the individuals and corporations thereby prohibited from making certain political contributions, labor unions and "any person acting in behalf thereof" was inconsistent with the right ."of the individual," as "declared in the declaration of rights," to "freedom of the press" and "of peaceable assembly," and therefore was an "excluded" matter which under art. 48 of the Amendments to the Constitution, The Initiative, II, § 2, could not be the subject of an initiative petition.

A certain law, proposed by the Initiative, which, if enacted, would require labor unions to file with a public official certain organizational and financial statements and reports, was not inconsistent with the right "of the individual," as "declared in the declaration of rights," to "freedom of the press" or "of speech" or of "peaceable assembly" and therefore was not an "excluded" matter which under art. 48 of the Amendments to the Constitution, The Initiative, II, § 2, could not be the subject of an initiative petition.

SIX PETITIONS, three for writs of mandamus and three for writs of certiorari, all filed in the Superior Court on August 7, 1946, and described in the opinion.

The cases were reported by *Hanify*, J.

In this court the cases were submitted on briefs.

*J. H. Morris*, for the petitioners.

*R. Clapp*, Assistant Attorney General, for the Secretary of the Commonwealth and another; *M. T. Silverstein*, City Solicitor, for the registrars of voters of Everett.

LUMMUS, J.   Under the Forty-eighth Amendment to the Constitution of the Commonwealth, which provides for enactment by vote of the people of a proposed law initiated by ten qualified voters of the Commonwealth, two proposed laws were initiated by ten such voters, and are about to be placed on the ballot and submitted to popular vote at the coming State election.

One of those proposed laws is entitled "An Act relative to contributions by labor unions or persons acting in behalf

thereof for political purposes or to campaign funds," and purports to amend G. L. c. 55, § 7, "as amended by" St. 1938, c. 75, by "striking out the first sentence and inserting in place thereof" the following: "No corporation carrying on the business of a bank, trust, surety, indemnity, safe deposit, insurance, railroad, street railway, telegraph, telephone, gas, electric light, heat, power, canal, aqueduct, or water company, or any company having the right to take land by eminent domain or to exercise franchises in public ways, granted by the commonwealth or by any county, city or town, no trustee or trustees owning or holding the majority of the stock of such a corporation, no business corporation incorporated under the laws of or doing business in the commonwealth, no officer or agent acting in behalf of any corporation mentioned in this section, and no labor union or any person acting in behalf thereof shall directly or indirectly give, pay, expend or contribute, any money or other valuable thing in order to aid, promote or prevent the nomination or election of any person to public office, or to aid, promote or antagonize the interests of any political party, or to influence or affect the vote on any question submitted to the voters."

The effect of the proposed law is to include a "labor union or any person acting in behalf thereof" within the prohibition of political contributions, equally with the corporations and persons previously specified in the statute. The reference to the amendment made by St. 1938, c. 75, was a mistake, for the amendment thereby made changed only the second sentence of that section and left the first sentence unchanged. This erroneous reference was struck out by the ten persons who initiated the proposed law, with a proper certificate by the Attorney General, under the authority to amend a proposed law given them by art. 48 of the Amendments, The Initiative, V, § 2. Plainly this amendment was "perfecting in its nature" and did not "materially change the substance of the measure." We think that the proposed law must be dealt with as changed by the amendment. See *Opinion of the Justices,* 318 Mass. 793, 798.

But that perfecting amendment does not remove all diffi-

culty.  The fact is that G. L. c. 55, § 7, had been redrafted
by St. 1943, c. 273, § 1.    That redraft — for the most part —
made only unimportant verbal changes in the first sentence
of G. L. c. 55, § 7, as it appears in the Tercentenary Edition.
But it did make one change of substance.   Prior to St. 1943,
c. 273, § 1, the statutory permission to a corporation to
make political contributions with respect to a question sub-
mitted to the voters materially affecting its property, busi-
ness or assets, was contained in the second sentence of § 7,
and constituted an exception to the broad prohibition de-
clared by the first sentence.   In St. 1943, c. 273, § 1, that
statutory permission was brought up into the first sentence,
so that the broad prohibition of corporate political contri-
butions for the purpose of "influencing or affecting the vote
on any question submitted to the voters," was followed im-
mediately by the exception created by the words "other
than one materially affecting any of the property, business
or assets of the corporation."

The proposed law would substitute the sentence already
quoted therefrom for the first sentence of G. L. c. 55, § 7.
If enacted by the people, we think it would substitute the
sentence already quoted from the proposed law for the first
sentence of G. L. c. 55, § 7, in the form in which that first
sentence now appears in St. 1943, c. 273, § 1.   One result
would be that a corporation described in that sentence would
no longer have a right to make any political contribution
for the purpose of influencing or affecting the popular vote
on any question submitted to the voters even though that
question might materially affect the property, business or
assets of the corporation.

The "summary" of that proposed law as determined by
the Attorney General under Amendment 74 is as follows:
"This measure amends Section 7 of Chapter 55 of the Gen-
eral Laws (Ter. Ed.) which prohibits business corporations,
banks, public utility companies and certain others from
making political contributions, so that labor unions and any
person acting in behalf of a labor union are also prohibited
from making political contributions."

The other proposed law is wholly new.   It requires from

labor unions reports to the commissioner of labor and industries as to the names and addresses of the officers, their salaries, the scale of dues, initiation fees, fines and assessments, and the amounts collected therefor, and all expenditures, which reports are to be open to public inspection. The full text of the proposed law appears in a footnote.[1] The summary of that proposed law as determined by the Attorney General under Amendment 74, § 4, is as follows: "No labor union may be operated or maintained unless there is filed with the Commissioner of Labor and Industries a statement signed by the President and Treasurer setting forth the union's officers, aims, scale of dues, fees, fines, assessments and the salaries of the officers. The President and Treasurer of a labor union is required to file annually with the Commissioner of Labor and Industries a detailed statement in writing setting forth all receipts and expenditures of the union which shall be open to the public, and the said Commissioner is given the power to summons witnesses and records; and there is a penalty of not less than $50.00 nor more than $500.00 for whoever

---

[1] "An Act to provide that labor unions shall file certain statements and reports with the commissioner of labor and industries. Be it enacted by the People, and by their authority as follows: Section 1. No person or association of persons shall operate or maintain a labor union unless and until there has been filed with the commissioner of labor and industries a statement in writing signed by the president and secretary of such labor union, setting forth the names and addresses of all of the officers of such union, the aims and objects of said union, the scale of dues, initiation fees, fines and assessments to be charged to the members, and the salaries to be paid to the officers. Section 2. The president and secretary of such labor unions shall thereafter make an annual report to the commissioner of labor and industries in such form as he may prescribe, and signed by the president and secretary of such labor union, setting forth the amount of money collected for initiation fees, dues, fines and assessments, and setting forth the amount paid in salaries to officers, listing their names and addresses, and the amount paid to each of such officers, and setting forth all other expenditures, listing the name and address and the amount paid to each person. Section 3. The commissioner shall have the power to require by summons the attendance and testimony of witnesses, the production of books, papers and documents and to administer oaths. Section 4. The commissioner of labor and industries shall keep a record of all statements and reports submitted to him under the provisions of this chapter, all of which shall be open to public inspection. He shall report to the attorney general instances of neglect or omission on the part of any person or association of persons to comply with the provisions of this chapter for the enforcement of the penalties therefor. Section 5. Whoever violates either section one or section two, or whoever knowingly makes or files a statement or report under section one or section two, which statement or report is false in any material representation, shall be punished by a fine of not less than fifty dollars nor more than five hundred dollars."

fails to file a statement or 'whoever knowingly makes a false statement."

The two initiative petitions for the proposed laws in question were filed in the office of the Secretary of the Commonwealth on September 5, 1945. Both petitions had been signed by the same ten qualified voters of the Commonwealth. All ten signers were residents of and voters in Everett, and each initiative petition was accompanied (a) by a certificate signed by the registrars of voters of Everett that all ten signers were qualified voters of Everett, (b) by a certificate signed by the Attorney General in the form prescribed by § 1 of Amendment 74 to the Constitution, amending Amendment 48, The Initiative, II, Initiative Petitions, § 3, and (c) by what purported to be a "fair, concise summary, as determined by the attorney general," of the proposed law, required by Amendment 74 to the Constitution, which amends parts of the original Amendment 48.

The required number of additional qualified voters having signed the initiative petitions (Amendment 48, The Initiative, V, Legislative Action on Proposed Laws, § 1), they were duly transmitted to the clerk of the House of Representatives on January 2, 1946, as required by Amendment 48, The Initiative, II, Initiative Petitions, § 4. The General Court having failed to enact either proposed law before the first Wednesday of June last, or at any other time, and the required number of additional signatures of qualified voters having been duly obtained, the Secretary of the Commonwealth intends to submit both proposed laws to the people at the coming State election. The successive steps in the process of legislation by the initiative are recited in *Compton* v. *State Ballot Law Commission*, 311 Mass. 643, 645, 646.

Thomas W. Bowe, described as president of the Massachusetts State Federation of Labor, and a number of other petitioners described as officers of different labor unions, all being citizens and qualified voters of the Commonwealth, on August 7, 1946, began legal proceedings for the purpose of preventing the submission to popular vote of the two

proposed laws already described. See *Morrissey* v. *State Ballot Law Commission*, 312 Mass. 121, 137. The case (number 10366), which relates to the proposed law forbidding political contributions, and another case (number 10367), which relates to the proposed law requiring reports, are petitions for writs of mandamus forbidding the Secretary of the Commonwealth to submit these proposed laws to the people. Another pair of cases (number 10368, relating to the proposed law forbidding political contributions, and number 10369, relating to the proposed law requiring reports) are brought against the Attorney General, and are petitions for writs of certiorari to quash the "summary" as determined by the Attorney General, and his certificate under § 1 of Amendment 74, as to each of the proposed laws. The last pair of cases (numbers 10370 and 10371, which relate to the proposed law requiring reports) are brought against the registrars of voters of Everett, to attack, by mandamus and certiorari respectively, their certificate that "Jos. Anthony Mavilio," a name appearing to be that of one of the ten original signers upon the initiative petition for that proposed law, is the name of a qualified voter of Everett.

The case numbered 10366 is reported from the Superior Court upon the demurrer of the respondent, without decision. The other case against the Secretary of the Commonwealth is reported from the Superior Court without decision after the facts had been found to be as agreed in writing by the parties. The two cases against the Attorney General, and the two cases against the registrars of voters of Everett, are reported from the Superior Court without decision after the facts had been found to be as agreed in writing by the parties.

1. *The signature of Mavilio.* One of the ten original signers of the initiative petitions was Joseph Anthony Mavilio of 4 Hawthorne Street, Everett. His name appeared on the list of registered qualified voters as "Joseph A. Mavilio." He signed the initiative petition for the proposed law requiring reports, "Jos. Anthony Mavilio." It is agreed that both names stand for one and the same man, and that his

residence was as stated on the initiative petitions. The only point made against the validity of his signature is that in one instance he did not sign his name in the precise form in which it appeared on the list.

Amendment 48, General Provisions, I, Identification and Certification of Signatures, authorizes the making of provision by law "for the proper identification and certification of signatures" to initiative petitions. General Laws (Ter. Ed.) c. 53, § 22A, as it appears in St. 1943, c. 51, makes applicable to initiative petitions, "so far as apt," the "provisions of law relative to the signing of nomination papers of candidates for state office, and to the identification and certification of names thereon and submission to the registrars therefor." *Compton* v. *State Ballot Law Commission*, 311 Mass. 643, 647, et seq. Turning to the "provisions of law" thus made applicable to initiative petitions, we find that a signer of a nomination paper must, in general, sign "with his name as registered." G. L. (Ter. Ed.) c. 53, § 7, as the material part of it appears in St. 1943, c. 334, § 3. By the same § 7 as it appears in St. 1936, c. 4, § 1, "the registrars shall check each name to be certified by them on the nomination paper and shall forthwith certify thereon the number of signatures so checked which are names of voters . . . and only names so checked shall be deemed to be names of qualified voters for the purposes of nomination."

In *Compton* v. *State Ballot Law Commission*, 311 Mass. 643, 651, it was held that the checking and certification of signatures must be done by comparison with the current annual register kept by the registrars. The requirement that the signer shall sign "with his name as registered" was said (pages 651, 652) to be for the purpose of enabling the registrars to ascertain, without burdensome investigation but by mere comparison with the list of registered qualified voters, whether the name signed was that of a qualified voter.

It is not necessary to consider whether the statutory provision, that "only names so checked shall be deemed to be names of qualified voters," implies the converse, that as matter of law names so checked shall be deemed the names of qualified voters. See *Compton* v. *State Ballot Law Com-*

*mission,* 311 Mass. 643, 658.   The Legislature has failed to provide for any review of the checking of names by registrars as the names of registered qualified voters, except the limited review for forgery or fraud provided by G. L. (Ter. Ed.) c. 53, § 22A, as it appears in St. 1943, c. 51. Ibid.   See also *Morrissey* v. *State Ballot Law Commission,* 312 Mass. 121.

The Attorney General and the Secretary of the Commonwealth must accept the certification of the registrars and have no authority to review it.   So far as the certification may possibly be opened up on a petition for a writ of certiorari against the registrars of voters, the granting of that writ is discretionary, as is the granting of a writ of mandamus.   Even if the trifling variance of the signature of Mavilio from his name as it appeared on the list constituted a failure to sign "his name as registered" (see *Putnam* v. *Bessom,* 291 Mass. 217), we think that the petitioners were guilty of laches in not discovering and taking advantage of that variance until after many thousands of signatures had been collected and the General Court had acted upon the proposed laws.   *Hill* v. *Mayor of Boston,* 193 Mass. 569, 574.   *Lowry* v. *Commissioner of Agriculture,* 302 Mass. 111, 121.   See *Compton* v. *State Ballot Law Commission,* 311 Mass. 643, 658.   Though there doubtless was no actual knowledge on the part of the petitioners, investigation would have been easy, and there was complete failure to "embrace opportunity to ascertain facts."   *J. C. Penney Co.* v. *Schulte Real Estate Co. Inc.* 292 Mass. 42, 46.

2. *The certificates by the Attorney General.*   It is agreed that the present Attorney General is a proponent and advocate of the proposed laws, and was active in procuring signatures to the initiative petitions by which they were proposed.   He is now a candidate for reëlection.   It is contended that these facts disqualify him from performing his constitutional duties of making the certificate required of him by Amendment 74, § 1, before an initiative petition can be filed, and of determining the "fair, concise summary" required of him by each of the sections of that amendment.

If the facts stated disqualify him, then no legislation of which the Attorney General is a proponent or advocate could ever be the subject of an initiative petition, for no other person is empowered to perform those duties.

It is plain that the Attorney General has no "interest" in these proposed laws in the legal sense as distinguished from the popular sense of the word "interest." No property right or other private right of his would be made more valuable by the enactment of the proposed laws. His constitutional duties are incident to legislation, and advocacy of the proposed laws can no more bar him from performance of those duties than similar advocacy could bar a member of the General Court or a Governor from voting upon or approving legislation when acted upon by the General Court.

The certificates of the Attorney General are attacked on the further ground that they are untrue in declaring, in accordance with the form prescribed by Amendment 74, § 1, that the proposed laws contain "only subjects not excluded from the popular initiative." We need not consider whether a certificate in the prescribed form can be attacked on the ground that it is untrue in fact. The question whether any subject that is excluded from the popular initiative is actually contained in the proposed laws will be discussed later.

The certificates of the Attorney General are also attacked on the ground that they are untrue in declaring, in accordance with the form prescribed by Amendment 74, § 1, that the proposed laws and their titles "are in proper form for submission to the people." So far as the proposed laws may concern matters excluded from the initiative, the questions argued will be considered later. Apart from such matters, there is no legal test by which the proposed laws and their titles can be held improper in form for submission to the people. There is still no requirement that a proposed law shall bear a title (*Opinion of the Justices*, 309 Mass. 631, 638, et seq.), except such intimation as may be contained in Amendment 74, § 1. Nowhere is it provided that the title of a proposed law shall be descriptive of it

to any particular degree, or wholly accurate so far as it is descriptive.

3. *The validity of the summary of each of the proposed laws, as determined by the Attorney General.*   Under Amendment 48, particularly General Provisions, III, Form of Ballot, an initiative law was submitted to the people with "a description to be determined by the attorney-general."   The purposes of requiring a "description" were said to be "first, that the signers of an initiative or referendum petition understand the law which they propose to submit to the voters, and, secondly, that the voters understand the law upon which they are voting."   *Evans* v. *Secretary of the Commonwealth*, 306 Mass. 296, 299.   In *Opinion of the Justices*, 271 Mass. 582, 589, quoted in part in *Opinion of the Justices*, 294 Mass. 610, 613, in *Opinion of the Justices*, 297 Mass. 582, 587, and in *Opinion of the Justices*, 309 Mass. 571, 587–589, it was said, "'Description' in these circumstances signifies a fair portrayal of the chief features of the proposed law in words of plain meaning, so that it can be understood by the persons entitled to vote.   It must be complete enough to convey an intelligible idea of the scope and import of the proposed law.   It ought not to be clouded by undue detail, nor yet so abbreviated as not to be readily comprehensible.   It ought to be free from any misleading tendency, whether of amplification, of omission, or of fallacy.   It must contain no partizan coloring."

In a number of cases a description which had no fault except that it did not point out every important change in the law that would be accomplished by the enactment of the proposed law was held fatally defective.   The most recent of those cases is *Evans* v. *Secretary of the Commonwealth*, 306 Mass. 296, in which the earlier cases are reviewed.   But a law of substantial length and complication could seldom be fully described in fewer words than those of the law itself.   Unless the description were to be "clouded by undue detail" minor features of the law must be omitted or covered sketchily.   In *Opinion of the Justices*, 309 Mass. 571, 589–591, a description containing certain errors and omissions, which occupied nine pages, and concerned a

complicated proposed law, was said (page 590) not "to fall so far short of stating the main characteristics of the proposed law as to invalidate the petition," and it was declared that "the Constitution is not to be so interpreted as to place the rights of petitioners at the risk of a slight deviation from technical exactness in the language of the description as determined by the Attorney General."

In *Opinion of the Justices*, 309 Mass. 631, the justices of this court on June 23, 1941, gave their opinions with respect to a bill pending in the General Court, providing that when in the opinion of the Attorney General a "complete and comprehensive" description of an initiative bill "would be too long and too complicated to be easily read and understood by the voters during the time permitted by section eighty-two of chapter fifty-four for marking their ballots," he may, in determining the description, employ a "summarized description." The justices gave their opinions that the implications resulting from the use of the word "description" in Amendment 48 could not be narrowed or cut down by legislation. It was said (page 643), "The words 'summarized description' naturally import brevity and conciseness. . . . These words, considered by themselves, do not necessarily import a lack in the description of the completeness required by the Constitution. A 'summarized description' doubtless may also be a complete description. But the words 'summarized description' as used in the proposed section obviously import a difference between a 'summarized description' and a 'complete and comprehensive description.' According to the natural interpretation of the section as a whole, it permits a 'summarized description' that is not a 'complete and comprehensive description,' that is, it permits a description that does not meet the constitutional requirement of completeness."

On July 8, 1941, soon after that advisory opinion was handed down on June 23, 1941, the General Court in joint session agreed to what is now Amendment 74. It was again agreed to in joint session in 1943, and was approved and ratified by the people on November 7, 1944. By that

amendment the requirement of a "description to be determined by the attorney-general," in Amendment 48, was changed to "a fair, concise summary, as determined by the attorney general." Evidently, in view of the legislative history already stated, the intention was to relax the requirements which had been found implicit in the word description. Conciseness is emphasized in Amendment 74, and conciseness and completeness are often incompatible.

We think that under the relaxed requirements of Amendment 74 the summary determined by the Attorney General with respect to the proposed law relative to reports cannot be pronounced violative of the Constitution. The summary with respect to that proposed law is attacked upon grounds that seem to us without merit. The substance of the attack is merely that the summary in some small matters lacks completeness. The attack upon the summary of the proposed law forbidding political contributions has more substance. But because of our decision on the question whether that proposed law is excluded from the initiative, we need not decide whether the defects in that summary are fatal.

4. *The question whether either of the proposed laws, if enacted, would deny the equal protection of the laws, or otherwise would violate the Constitution of the United States, or some part of the Constitution of Massachusetts other than Amendment 48 or Amendment 74, is not open at this time.*

It is contended that this court ought to prevent the proposed laws from being placed on the ballot, because if enacted they would be inoperative because in conflict with the provisions of the Fourteenth Amendment to the Constitution of the United States with respect to the equal protection of the laws and other provisions of that Constitution, as well as provisions of the Constitution of Massachusetts other than Amendment 48 or Amendment 74, and consequently enactment would be futile.

The nature of the power of courts to enforce the provisions of the Constitution of Massachusetts as against a conflicting Massachusetts statute, and the provisions of the Federal Constitution or a Federal statute made pursuant to that Constitution as against a conflicting State Consti-

tution or statute (U. S. Const. art. 6; *Schaffer* v. *Leimberg,* 318 Mass. 396, 405) has been the subject of much misconception. That power is not a judicial veto, nor an invasion of the legislative field, nor a usurpation by courts of a nonjudicial function. On the contrary, it is a wholly and even typically judicial function. It is a necessary function, if constitutional provisions are to be the supreme law, and not mere declarations of policy to be disregarded by the Legislature at will.

The power to hold statutes unconstitutional is the logical and inevitable result of the existence of law-making power at different levels of authority. Anglo-American law has long been familiar with the principle that the enactments of an inferior law-making body, such as ordinances, by-laws and administrative regulations, are inoperative when they conflict with the enactments of Parliament, Congress or the General Court, as the case may be. *The King* v. *Company of Barber Surgeons,* 1 Ld. Raym. 584. *The King* v. *Miller,* 6 T. R. 268. *Shannon* v. *Mayor of Cambridge,* 231 Mass. 322, 324. *Kane* v. *School Committee of Woburn,* 317 Mass. 436, 438. *Hestonville, Mantua & Fairmount Passenger Railroad* v. *Philadelphia,* 89 Penn. St. 210, 218, 219. *People* v. *Gilbert,* 68 Misc. (N. Y.) 48. The people of America have added to that long established principle nothing but the concept of a law still higher than any made by the legislative branch of government, namely, the fundamental and supreme law made by the people themselves and embodied in a written Constitution. The people by the Constitution created the legislative branch of government as well as the executive and judicial branches, and conferred and at the same time limited the powers of each of them. Each must act pursuant to the Constitution and within the authority conferred by it. Once the idea of enactments at different levels of authority is grasped, it becomes clear that a provision contained in a statute cannot have any force as law if it conflicts with any provision contained in the higher law of the Constitution.

In deciding constitutional questions courts perform a judicial function not different in kind from that which they

habitually perform in cases that involve no constitutional question. In every case before it a court must determine what the law is, and must apply that law to the facts. When one party relies on some provision of a statute, and the other relies on some provision of the higher law of the Constitution, with which, it is alleged, the statute conflicts, the court, in order to determine what the law really is, must first decide whether there is conflict. If there is, its duty is to apply the higher law of the Constitution, and disregard the statute. *Schaffer* v. *Leimberg*, 318 Mass. 396, 400, 401. *Adkins* v. *Children's Hospital*, 261 U. S. 525, 544. *United States* v. *Butler*, 297 U. S. 1, 62, 63. *Carter* v. *Carter Coal Co.* 298 U. S. 238, 296, 297.

When it thus has to pass upon the validity of an act of a coördinate branch of government, a court exercises a grave and delicate function. A court never seeks to decide a constitutional question. It never volunteers an opinion. It remains silent and inactive until some case comes before it in which the rights of the parties depend upon the constitutional validity of a statute, and a decision upon that question cannot be avoided.[1] *Broadhurst* v. *Fall River*, 278 Mass. 167, 170. *Nichols* v. *Commissioner of Public Welfare*, 311 Mass. 125, 130. *Cole* v. *Chief of Police of Fall River*, 312 Mass. 523, 526. *Massachusetts* v. *Mellon*, 262 U. S. 447, 483–485. *Crowell* v. *Benson*, 285 U. S. 22, 62. *Coffman* v. *Breeze Corporations, Inc.* 323 U. S. 316, 325. *Alabama State Federation of Labor* v. *McAdory*, 325 U. S. 450.

In many cases it would be difficult or even impossible to say abstractly and unconditionally that a statute is or is not constitutional. In part its provisions may be unconstitu-

---

[1] No exception to this principle is created by the provision contained in the Constitution of Massachusetts, Part II, c. 3, art. 2, by which either branch of the Legislature, as well as the Governor and Council, is authorized "to require the opinions of the justices of the supreme judicial court, upon important questions of law, and upon solemn occasions." Under that provision advisory opinions upon constitutional questions have often been required and given. But such advisory opinions are given by the justices as individuals, not by the court. They are not judicial decisions and are not binding upon the court as precedents. If the same question arises later in the course of litigation, the duty of the court is to consider it anew, without being affected by the advisory opinion. *Commonwealth* v. *Welosky*, 276 Mass. 398, 400. See also Borchard, Declaratory Judgments (2d ed. 1941) 71–80.

tional, yet the remainder may be constitutional. *Commonwealth* v. *Petranich,* 183 Mass. 217, 220. *Commonwealth* v. *Caldwell,* 190 Mass. 355, 358. *Worcester County National Bank, petitioner,* 263 Mass. 444, 460, 461. A statute may be unconstitutional as applied to some states of fact, but constitutional as applied to others. *Magee* v. *Commissioner of Corporations & Taxation,* 256 Mass. 512, 518. *Vigeant* v. *Postal Telegraph Cable Co.* 260 Mass. 335. *Commonwealth* v. *New England Transportation Co.* 282 Mass. 429, 437. *Alabama State Federation of Labor* v. *McAdory,* 325 U. S. 450, 462. Only when the impact of a statute upon particular individuals, who have both the opportunity and the incentive to defend their rights by argument, and upon a set of definite facts established after genuine controversy, has been shown, can a court decide a constitutional question with confidence that relevant considerations have not been overlooked. *Brest* v. *Commissioner of Insurance,* 270 Mass. 7, 16. *Polk Co.* v. *Glover,* 305 U. S. 5, 10. *United States* v. *Johnson,* 319 U. S. 302. *Alabama State Federation of Labor* v. *McAdory,* 325 U. S. 450. *Congress of Industrial Organizations* v. *McAdory,* 325 U. S. 472. At any rate, no form of proceeding exists at common law or under general equity practice by which the constitutional validity of a statute can be tested in a direct proceeding for that purpose. *Horton* v. *Attorney General,* 269 Mass. 503, 513.[1]

Amendment 48 puts initiative legislation upon exactly the same footing as legislation by the General Court with respect to its constitutional validity. Both the voters and the General Court, in enacting laws, act under powers granted

---

[1] But G. L. c. 231A, inserted by St. 1945, c. 582, provides for the making of "binding declarations of right, duty, status and other legal relations," in "any case in which an actual controversy has arisen." § 1. (See *Coffman* v. *Breeze Corporations, Inc.* 323 U. S. 316; *Alabama State Federation of Labor* v. *McAdory,* 325 U. S. 450; *Congress of Industrial Organizations* v. *McAdory,* 325 U. S. 472.) By § 2 such declarations are authorized with respect to a "charter, statute, municipal ordinance or by-law, or administrative regulation, including determination of any question of construction or validity thereof which may be involved in such determination." By § 8 a declaration upon a question of constitutionality is contemplated, but it is provided that "all persons shall be made parties who have or claim any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceeding." See also Borchard, Declaratory Judgments (2d ed. 1941) 764–788.

and limited by the Constitution.  Amendment 48, The In-
itiative, II, Initiative Petitions, § 2, declares, "The limita-
tions on the legislative power of the general court in the
constitution shall extend to the legislative power of the
people as exercised hereunder."  *Commonwealth* v. *Higgins,*
277 Mass. 191, 193.  The people acting by means of the
initiative, like the General Court, can enact measures that
violate the fundamental and supreme law of the Constitu-
tion and that consequently have no force or effect.  But no
court can interfere with the process of legislation, either by
the General Court or by the people, before it is completed,
to prevent the possible enactment of an unconstitutional
measure.  *Horton* v. *Attorney General,* 269 Mass. 503, 514.
*Opinion of the Justices,* 309 Mass. 571, 580.  *Prentis* v. *At-
lantic Coast Line Co.* 211 U. S. 210, 228, 230.  The judiciary
is barred from the legislative field just as it is from the
executive.  Art. 30 of the Declaration of Rights.  *Rice* v.
*Governor,* 207 Mass. 577.  *Stretch* v. *Timilty,* 309 Mass. 267.

For these reasons we are unable to consider at this time
the general contention that if enacted the proposed laws
would be unconstitutional.

5. *The objection that the proposed laws relate to matters
that are excluded from the initiative is open at this time.*  In
adopting Amendment 48, since modified by Amendment
74, the people declared that they "reserve to themselves"
the popular initiative.  But they defined it as "the power
of a specified number of voters to submit . . . laws to the
people for approval or rejection."  Thus they enabled any
small group having the ability to collect the required num-
ber of signatures, to compel submission to the whole elec-
torate of such matters as that group might choose.  Some
matters are naturally unsuitable for popular lawmaking in
that way, for various reasons.  The people for their own
protection have provided that the initiative shall not be
employed with respect to certain matters.  Unless the
courts had power to enforce those exclusions, they would
be futile, and the people could be harassed by measures of
a kind that they had solemnly declared they would not
consider.  We think that the question whether an initiative

petition relates to an excluded matter is a justiciable question. *Horton* v. *Attorney General*, 269. Mass. 503, 511, 512. *Christian* v. *Secretary of the Commonwealth*, 283 Mass. 98. *Mount Washington* v. *Cook*, 288 Mass. 67. *Opinion of the Justices*, 294 Mass. 607, 609. *Opinion of the Justices*, 297 Mass. 577. *Opinion of the Justices*, 303 Mass. 615, 626. *Evans* v. *Secretary of the Commonwealth*, 306 Mass. 296.

6. *Are the proposed laws "inconsistent with" the right "of the individual" as "declared in the declaration of rights" to "freedom of elections," and consequently excluded from lawmaking by the initiative by Amendment 48, The Initiative, II, Initiative Petitions, § 2?* [1]

Article 9 of the Declaration of Rights prefixed to the Constitution of Massachusetts declares that "All elections ought to be free." The meaning of that declaration has been little discussed in our decisions. In some States the idea of equality is expressly coupled with that of freedom. Other provisions of our own Constitution have been held to require equality in the right to vote. *Moore* v. *Election Commissioners of Cambridge*, 309 Mass. 303, 313, 320, 321. In Pennsylvania, under a constitutional requirement that elections shall be free and equal, it has been said that the Constitution "enjoins the duty in the abstract, but leaves the means of accomplishment in the concrete to the legislature." *Winston* v. *Moore*, 244 Penn. St. 447, 455. In *DeWalt* v. *Bartley*, 146 Penn. St. 529, 540, the court said, "An election to be free must be without coercion of every description. An election may be held in strict accordance with every legal requirement as to form, yet, if in point of fact the voter casts the ballot as the result of intimidation; if he is deterred from the exercise of his free will by means of any influence whatever, although there be neither violence nor physical coercion, it is not a free and equal election within the spirit of the constitution." That definition was

---

[1] See the following provision in the third paragraph of Amendment 48 under The Initiative, II, Initiative Petition, § 2, Excluded Matters: "No proposition inconsistent with any of the following rights of the individual, as at present declared in the declaration of rights, shall be the subject of an initiative or referendum petition: . . . freedom of the press; freedom of speech; freedom of elections; and the right of peaceable assembly." — REPORTER.

quoted with approval in *Neelley* v. *Farr,* 61 Colo. 485, 511.

We see nothing in either of the proposed laws that impairs the freedom of a voter to express his choice as to men or measures. Indeed, the proposed law forbidding political contributions, like corrupt practices acts in general, would tend to increase the freedom of elections by removing influences upon the voter that the use of money can bring to bear. *Ashley* v. *Three Justices of the Superior Court,* 228 Mass. 63, 78.

7. *Is the proposed law forbidding political contributions "inconsistent with" the right "of the individual" as "declared in the declaration of rights" to "freedom of the press" or "of speech" or of "peaceable assembly," and consequently excluded from lawmaking by the initiative by Amendment 48, The Initiative, II, Initiative Petitions, § 2?*

Freedom of speech is not expressly mentioned in the Massachusetts Declaration of Rights, except as it concerns deliberations in the General Court. Art. 21. *Coffin* v. *Coffin,* 4 Mass. 1. Decisive of this case, however, are the "liberty of the press" which, under art. 16 of the Declaration of Rights, "ought not . . . to be restrained in this commonwealth," and the right of "the people" in an "orderly and peaceable manner, to assemble to consult upon the common good," declared by art. 19 of the Declaration of Rights. All these freedoms are comparable to the rights of "freedom of speech" and "of the press," and the right of the people "peaceably to assemble," declared in the First Amendment to the Constitution of the United States, and held to be part of the "liberty" protected by the Fourteenth Amendment against abridgment by a State without due process of law. *Grosjean* v. *American Press Co. Inc.* 297 U. S. 233, 244. *De Jonge* v. *Oregon,* 299 U. S. 353, 364. *Lovell* v. *Griffin,* 303 U. S. 444, 450. *Schneider* v. *State,* 308 U. S. 147, 160. *Thornhill* v. *Alabama,* 310 U. S. 88, 95. *Chaplinsky* v. *New Hampshire,* 315 U. S. 568, 570, 571. *Douglas* v. *Jeannette,* 319 U. S. 157, 162. But what we must decide is not whether the proposed law would abridge these freedoms as they exist under the Federal

Constitution, but whether the proposed law would abridge them as they exist under the Massachusetts Declaration of Rights, for, if it would, Amendment 48 excludes the proposed law from the popular initiative. Upon that question of Massachusetts law, Federal decisions are persuasive, but not controlling.

"The liberty of the press is not confined to newspapers and periodicals. It necessarily embraces pamphlets and leaflets. These indeed have been historic weapons in the defense of liberty, as the pamphlets of Thomas Paine and others in our own history abundantly attest. The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion." Hughes, C. J., in *Lovell* v. *Griffin*, 303 U. S. 444, 452. "Liberty of circulating is as essential to that freedom as liberty of publishing; indeed, without the circulation, the publication would be of little value." *Ibid.*, quoting from *Ex parte Jackson*, 96 U. S. 727, 733.

Primarily, no doubt, the liberty of the press meant liberty to publish without the previous license that had been customarily required in Europe. *Commonwealth* v. *Blanding*, 3 Pick. 304, 313, 314. *Commonwealth* v. *Kneeland*, 20 Pick. 206, 219. *Grosjean* v. *American Press Co. Inc.* 297 U. S. 233, 245, 246. *Lovell* v. *Griffin*, 303 U. S. 444, 451, 452. But freedom from the need of previous license by no means satisfies the constitutional guaranty. Authors and publishers are entitled to a high degree of protection from legal accountability for what they write and publish. *Thornhill* v. *Alabama*, 310 U. S. 88, 101, 102. It is true that the three freedoms under discussion are not absolute. "Constitutional freedom means liberty regulated by law. . . . Liberty is immunity from arbitrary commands and capricious prohibitions, but not the absence of reasonable rules for the protection of the community." *Commonwealth* v. *Karvonen*, 219 Mass. 30, 32. All three freedoms under discussion are subject to reasonable regulation in the interest of the public. *Commonwealth* v. *Abrahams*, 156 Mass. 57. *Commonwealth* v. *Surridge*, 265 Mass. 425. *Commonwealth* v. *Nichols*, 301 Mass. 584, 586, reversed

sub nomine *Nichols* v. *Massachusetts*, 308 U. S. 147. *Commonwealth* v. *Prince*, 313 Mass. 223, 229, affirmed sub nomine *Prince* v. *Massachusetts*, 321 U. S. 158. *Davis* v. *Massachusetts*, 167 U. S. 43, affirming *Commonwealth* v. *Davis*, 162 Mass. 510. *Hague* v. *Committee for Industrial Organization*, 307 U. S. 496. *Cox* v. *New Hampshire*, 312 U. S. 569. *Bridges* v. *California*, 314 U. S. 252. *Chaplinsky* v. *New Hampshire*, 315 U. S. 568. *Valentine* v. *Chrestensen*, 316 U. S. 52.

But complete freedom remains the rule, unless and until regulated or restricted on rational grounds relating to the public welfare. *Herndon* v. *Lowry*, 301 U. S. 242, 258. *Bridges* v. *California*, 314 U. S. 252, 261–263. *Thomas* v. *Collins*, 323 U. S. 516, 529, 530. This is implicit in *Commonwealth* v. *Isenstadt*, 318 Mass. 543. The Supreme Court of the United States has gone very far in protecting freedom of speech and freedom of the press in circumstances in which their exercise was annoying and, to many minds, a nuisance. *Schneider* v. *State* (and *Nichols* v. *Massachusetts*), 308 U. S. 147. *Murdock* v. *Pennsylvania*, 319 U. S. 105. *Martin* v. *Struthers*, 319 U. S. 141. *Douglas* v. *Jeannette*, 319 U. S. 157. *Marsh* v. *Alabama*, 326 U. S. 501. *Tucker* v. *Texas*, 326 U. S. 517.

The liberty of the press is enjoyed, not only by individuals, but also by associations of individuals such as labor unions (*Hague* v. *Committee for Industrial Organization*, 307 U. S. 496), and even by corporations, although a corporation is not a "citizen" and must find its protection against abridgment of its liberty by State action in the due process clause rather than the privileges and immunities clause of the Fourteenth Amendment. *Grosjean* v. *American Press Co. Inc.* 297 U. S. 233, 243, 244. Compare *Western Turf Association* v. *Greenberg*, 204 U. S. 359, 363, *Hague* v. *Committee for Industrial Organization*, 307 U. S. 496, 527, and for an appreciation of the divergence in the authorities, *Independent Service Corp.* v. *Tousant*, (Dist. Mass.) 56 Fed. Sup. 75, 78. See also Rutledge, J., in *May Department Stores Co.* v. *National Labor-Relations Board*, 326 U. S. 376, 403, 404.

One of the chief reasons for freedom of the press is to insure freedom, on the part of individuals and associations of individuals at least, of political discussion of men and measures, in order that the electorate at the polls may express the genuine and informed will of the people. Brandeis, J., in *Whitney* v. *California,* 274 U. S. 357, 375. Hughes, C. J., in *Stromberg* v. *California,* 283 U. S. 359, 369. Individuals seldom impress their views upon the electorate without organization. They have a right to organize into parties, and even into what are called "pressure groups," for the purpose of advancing causes in which they believe. They have a right to engage in printing and circulating their views, and in advocating their cause in public assemblies and over the radio. All this costs money, and if all use of money were to be denied them the result would be to abridge even to the vanishing point any effective freedom of speech, liberty of the press, and right of peaceable assembly.

It remains to apply these principles to the proposed law under discussion. We do not doubt that labor unions, like individuals, may be curbed by corrupt practices acts and prevented from dumping immense sums of money into political campaigns. But under the proposed law the political activities of labor unions are not regulated or curbed but are substantially destroyed. Deprived of the right to pay any sum of money for the rental of a hall in which to hold a public rally or debate, or for printing or circulating pamphlets, or for advertising in newspapers, or for buying radio time, a union could not carry on any substantial and effective political activity. It could not get its message to the electorate. Its rights of freedom of the press and of peaceable assembly would be crippled. In the language of Amendment 48, The Initiative, II, Initiative Petitions, § 2, the proposed law is "inconsistent with" those rights, and consequently cannot be the subject of legislation by the popular initiative.

8. *Is the proposed law requiring reports "inconsistent with" the right "of the individual" as "declared in the declaration of rights" to "freedom of the press" or "of speech" or of "peaceable assembly," and consequently excluded from*

*lawmaking by the initiative by Amendment 48, The Initiative, II, Initiative Petitions, § 2?*

This proposed law prohibits none of the activities of a labor union. For all this proposed law provides, a labor union may indulge in political activities to the full extent of its desire. What the proposed law requires it to do is to make report of what it has done. Beyond that, the proposed law merely requires the filing of a statement giving certain facts relative to the organization as a prerequisite to operation. These mild regulations would be amply justified in the constitutional sense by the great power wielded by a labor union, and its capacity for harm if that power should rest in irresponsible hands and be exercised without public scrutiny. We see nothing in this proposed law "inconsistent with" the rights in question, and consequently hold that this proposed law is a proper subject of lawmaking by the initiative. We find nothing in *Thomas* v. *Collins*, 323 U. S. 516, or *Hill* v. *Florida*, 325 U. S. 538, that requires a conclusion to the contrary.

The result is that in the case of *Bowe* v. *Secretary of the Commonwealth*, number 10366, relating to the proposed law forbidding political contributions, a writ of mandamus is to issue, commanding the respondent Secretary of the Commonwealth not to submit that proposed law to the voters of the Commonwealth and not to cause to be printed on the ballots for the next State election any question relative to that law. In each of the five companion cases the petition is to be dismissed.

*So ordered.*