Winifred N. COTTER, Vincent J. Difazio, John P. Doris, William J. Dwan, William G. Knecht, Michael Locke, Patrick L. Murphy, and Thomas L. Sexton, Plaintiffs,

v.

CITY OF BOSTON, Defendant,

and

Massachusetts Association of Minority Law Enforcement Officers, Dennis A. White, and Harold White, Defendant–Intervenors.

No. CIV.A.99–11101–WGY.

United States District Court, D. Massachusetts.

March 21, 2002.

Nadine M. Cohen, Michael C. McLaughlin, Boston, MA, for Plaintiffs.

Boston Police Department Office of the Legal Advisor, Rubin & Rudman, Rory J. Fitzpatrick, Irene C. Freidel, Andrew C. Glass, Kirkpatrick & Lockhart LLP, Ginny Sinkel, Office of the Attorney General, Mary Jo Harris, Boston, MA, Robert L. Quinan, Jr., Assistant Attorney General, Government Bureau, Boston, MA, for Defendants.

Rheba Rutkowski, Bingham, Dana & Gould, Scott P. Lweis, Paige Scott Reed, Palmer & Dodge LLP, Boston, MA, for Interested Party.

*MEMORANDUM AND ORDER*

YOUNG, Chief Judge.

## I. INTRODUCTORY BACKGROUND

This is a case of alleged racial discrimination. Such cases come in two types.

The first involves allegations of public or private racial discrimination which are denied. While such cases give rise to complex problems of proof, the duty of a court once racial discrimination is established is clear and undoubted—to extirpate racial discrimination root and branch, adequately compensate its victims, and creatively invoke its equitable powers to provide equal opportunity to all citizens free of the blight of racial animus.

The second involves state-sponsored racial discrimination. Since, in certain narrowly-tailored circumstances, such state sponsored discrimination is at present undoubtedly lawful, such cases necessarily involve an exploration of whether justifying circumstances exist. This is such a case.

At the outset, therefore, it is appropriate to acknowledge two extraordinarily difficult aspects of any such case which sadly but inevitably make its resolution suspect and less acceptable to our society as a whole than is usually the case with a carefully-considered judicial opinion.

The first is a problem of definition. As a society we acknowledge and bewail our deeply troubled racial history—the horrors

of slavery, the tawdry (and frequently violent) legacy of Jim Crow, the subtle (and not so subtle) resistance to conferring genuine equal rights and equal opportunities upon all Americans. When we attack racial discrimination head on, problems of racial definition rarely arise because they are subsumed in the proof that a particular person or group has, in fact, been the victim of discrimination on the basis of racial animus.

When the state itself seeks to discriminate on the basis of "racial factors," however, and claims such discrimination is legally justified, then the problem of definition becomes acute because all Americans are vitally interested in precisely the basis upon which the state determines to confer governmental benefits such as jobs and promotions. Unfortunately, one searches the authoritative decisions in vain for any adequate definition. The decisions rather casually use terms such as "white," "black," "African American," "Hispanic," "Native American" and the like, as though we all agreed on their meaning in the specific case. Of course, we do not. *See generally, e.g.*, Rachel F. Moran, *The Mixed Promise of Multiculturalism*, 17 Harv. BlackLetter L.J. 47 (2001) (arguing that race is becoming a more fluid concept in America as demographics change, and that different racial groups have very different views on the desirability of embracing multiracial identities); Naomi Zack, *American Mixed Race: The U.S. 2000 Census and Related Issues*, 17 Harv. BlackLetter L.J. 33 (2001) (contending that race is a social and political construct, unsupported by biology, in which courts and lawmakers have acquiesced despite the absence of a foundation for doing so, and that legal recognition of mixed-race groups might help to break down rigid notions of race). There is more wisdom in Tiger Woods calling himself "Cablinasian," *see, e.g.*,

Michael A. Fletcher, *Woods Puts Personal Focus on Mixed–Race Identity*, Wash. Post, Apr. 23, 1997, at A1, than in all the gross racial classifications found in the governing decisions and the executive actions implementing race-based public policies.

Nor is the lack of definition surprising. If we go beyond self-definition and seek to confer some genuine meaning upon race-based identifiers, we rapidly find ourselves slipping into the most abhorrent racial stereotyping and classification—the very conduct directly forbidden by our Constitution and laws. We simply cannot condemn the notorious black codes, *see, e.g.*, Eric Foner, *Reconstruction: America's Unfinished Revolution, 1863–1877*, at 199–201 (1988) (outlining provisions of state black codes); Theodore Brantner Wilson, *The Black Codes and the South* 66–70, 72–75, 78–80 (1965) (same), and Nazi eugenics, *see, e.g.*, 4 Office of U.S. Chief of Counsel for Prosecution of Axis Criminality, *Nazi Conspiracy & Aggression* 8–9 (1946) (Nazi citizenship law defining who is and who is not a Jew in order to disqualify Jews from German citizenship), *quoted in part in Fullilove v. Klutznick*, 448 U.S. 448, 534 n. 5, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980) (Stevens, J., dissenting), while at the same time looking behind self-identification. The very idea of imposing some lexicon of United States government racial definitions is revolting.

Here the parties neatly sidestep the issue. This case involves a certain police promotional examination. Those who took the exam were asked to assign themselves to one of a number of pre-fixed racial identifiers. Not everyone did so. Those who did not were nevertheless consigned to a pre-fixed racial classification from the records of the Boston Police Department. It is unclear whether these records are the result of self-classification or observations

by someone within the Department.[1] As no party here challenges or seeks to examine these racial classifications, the Court adopts them, pointing out here that they are in the main based on individual self-identification, while a minority of exam takers were somehow assigned a pre-fixed racial classification by the Boston Police Department.

Second, the most difficult aspect of this case is the basic premise upon which the Court is required to approach it. Simply stated, the premise is that, as we ultimately seek a colorblind society under our Constitution, it is necessary in certain circumstances to discriminate along racial lines to move toward that society. *See, e.g., Regents of the Univ. of Cal. v. Bakke,* 438 U.S. 265, 407, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (Blackmun, J., concurring in the judgment in part and dissenting in part) ("In order to get beyond racism, we must first take account of race."). So imbedded is this premise in our constitutional jurisprudence that it is not for this Court to question it. Still, as discrimination necessarily begets discrimination, as racial discrimination is perhaps our society's most tragically divisive fault line, and as "[o]ur government is the potent, the omnipresent teacher" that "teaches the whole people by

its example," *Olmstead v. United States,* 277 U.S. 438, 468, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting), one cannot help but recall the reflexive statement of the field artillery officer in Vietnam: "We had to destroy the village to save it."

## II. PRIOR PROCEEDINGS

▪ Winifred N. Cotter, Vincent J. DiFazio, John P. Doris, William J. Dwan, William G. Knecht, Michael Locke, Patrick L. Murphy, and Thomas L. Sexton (collectively the "Plaintiffs"), all members of the Boston Police Department (the "Department"), brought this section 1983 action against the City of Boston (the "City") and James J. Hartnett, Jr. ("Hartnett"), in his official capacity as Personnel Administrator of the Commonwealth of Massachusetts Human Resources Division (the "Division"). The Plaintiffs allege that the City and Hartnett unlawfully discriminated against them in promoting to the rank of sergeant three black officers (the "Black Officers") who scored 84 on a 1996 civil service exam (the "1996 exam"), while declining to promote the Plaintiffs, who also scored 84. The Plaintiffs claim that the City and Hartnett violated the Fifth and Fourteenth Amendments to the Constitution.[2] The Massachusetts Association

---

1. Racial classification of United States government employees is routine and is frequently done on the basis of cursory visual observation. The federal courts, for example, gather data about the racial and ethnic background of employees primarily by relying upon individual self-identification, but when an individual does not self-identify, "visual identification may serve as the basis for providing the information. (That is, supervisory personnel should observe individual employees and provide the data based on observations.)" Admin. Office of the U.S. Courts, *The FY 2001 Fair Employment Practices Report* 4 (2001).

2. The Court dismissed the Plaintiffs' Fifth Amendment claim from the bench on January 9, 2001 [Docket No. 165]. The Fifth Amendment, though it does not expressly guarantee

equal protection under law as does the Fourteenth Amendment, is generally understood to include within its due process guarantee an equal protection component akin to that found expressly in the Fourteenth Amendment. *See Bolling v. Sharpe,* 347 U.S. 497, 499–500, 74 S.Ct. 693, 98 L.Ed. 884 (1954). This guarantee extends, however, only to those denied the equal protection of the laws by the *federal* government. *E.g., Gerena v. P.R. Legal Servs., Inc.,* 697 F.2d 447, 449 (1st Cir.1983). Those denied equal protection by the action of a state or local government are left to pursue relief under the Fourteenth Amendment. There are no federal actors involved in this litigation, and so the Plaintiffs' proper avenue of relief is under the Fourteenth Amendment, rather than the Fifth Amendment.

of Minority Law Enforcement Officers ("MAMLEO"), along with two of the Black Officers, Dennis A. White and Harold White, entered the lawsuit as defendant-intervenors after getting permission from the First Circuit, *Cotter v. Mass. Ass'n of Minority Law Enforcement Officers*, 219 F.3d 31 (1st Cir.2000), while Hartnett exited the lawsuit by settling with the Plaintiffs.

All of the parties remaining have filed cross-motions for summary judgment. The City acknowledges that it considered race in making its promotion decisions, but responds that it is nonetheless entitled to summary judgment for two reasons. First, the City contends that the Plaintiffs lack standing to complain of the City's race-conscious decision because the City would not have promoted the Plaintiffs even if the City had made its promotion decisions without regard to race. Second, the City argues that even if the Plaintiffs have standing, the City's actions were narrowly tailored to further three compelling government interests: advancing the operational needs of the City by ensuring a diverse police force that represents the communities it serves, remedying past discrimination perpetrated by the Department against minorities, and avoiding a lawsuit from MAMLEO or disgruntled minority officers.

MAMLEO's motion for summary judgment focuses on the past discrimination of the Department, and on the disparate impact the 1996 exam had on minority officers vis-a-vis white officers. MAMLEO posits that the City's interests in complying with applicable federal antidiscrimination law and, correlatively, in avoiding a lawsuit from MAMLEO or others that they claim would have surely followed from the violation of such law, constitute compelling state interests. Completing the strict scrutiny two-step, MAMLEO argues that the City's actions were narrowly tailored to further those interests.

The Plaintiffs reject these arguments and respond with a summary judgment motion of their own. The thrust of the Plaintiffs' argument is that most of the justifications for the City's use of race in making the promotion decisions are *post hoc* rationalizations that were not considered by the City at the time it made the decisions. According to the Plaintiffs, the only justification that was actually considered at the time of the promotion decisions was compliance with the EEOC Uniform Guidelines on Employee Selection Procedure (the "EEOC Guidelines"), which the Plaintiffs claim are no longer applicable to the Department as a result of the expiration of a consent decree between the Department and MAMLEO that arose out of prior litigation. As such, according to the Plaintiffs, the City is left with no valid, much less constitutionally compelling, justification for its admittedly race-based actions. The Plaintiffs argue further that, even if any of the justifications proffered by the City were actually considered by the Department at the time the decisions were made, and even if they are ruled to be compelling by this Court, the promotion decisions were not narrowly tailored, because other, less race-conscious measures were available.

## III. UNDISPUTED FACTS

On October 19, 1996, the Division administered the 1996 exam for the purpose of selecting police officers within the Department for promotion to the rank of sergeant. Am. Compl. ¶ 18 [Docket No. 13]; Callahan Aff. ¶ 8 [Docket No. 94]. Thirty-three black officers and 192 non-black officers achieved a passing score.[3] Callahan Aff. ¶ 11. In September 1997, the Depart-

---

**3.** A score of 70 or better was required to pass the written exam. Rutkowski Aff. Ex. 15 ¶ 6

(Expert Report of Kathleen K. Lundquist) [Docket No. 105].

ment decided to promote 30 police officers to the rank of sergeant. *Id.* ¶ 8; Evans Aff. ¶ 3 [Docket No. 93]. In October 1997, the Division certified a list of 69 candidates from all of the applicants who passed the 1996 exam;[4] the scores of the candidates on the certified list ranged from 92 to 82. Am. Compl. Ex. A; Callahan Aff. Ex. A. It was from this list certified by the Division that the Department was to draw in making promotions to sergeant. In December 1997, the Department promoted 30 police officers to sergeant from the certified list. Evans Aff. ¶ 3; Callahan Aff. ¶ 8.

Before making the promotions, however, the Department discovered that if it promoted in strict rank order from one to 30, 29 non-black officers and only one black officer would be promoted. *Id.* ¶ 9. The Department further learned that such a promotion plan would violate the EEOC Guidelines "four-fifths rule," which states that a selection procedure adversely impacts minorities if it yields a selection percentage for candidates from a minority group that is less than four-fifths of the selection percentage for non-minority candidates, 29 C.F.R. § 1607.4(D).[5] Callahan Aff. ¶ 9. Specifically, the Department calculated that if it promoted only one black officer out of the 33 black officers who passed the 1996 exam (3% selection percentage) while promoting 29 non-black officers out of the 192 who passed the 1996 exam (15% selection percentage), the ratio of the black officer selection percentage to

the non-black officer selection percentage would be around 20% (3% divided by 15%), *id.* Ex. B, well below the 80% required to avoid an inference of disparate impact. The Department therefore thought that it might be vulnerable to litigation by minority officers unless it promoted an additional three black officers, which would yield a total of four black officers promoted and would bring the Department into compliance with the four-fifths rule. This change would lead to a 12% selection percentage among black officers (4/33) compared to a 14% selection percentage among non-black officers (26/192), yielding a black/non-black selection percentage ratio of approximately 89%. *Id.* Ex. B.

The Department's December 1997 promotions therefore included the three Black Officers who scored 84 on the 1996 exam, but excluded five non-black applicants who scored 85 on the 1996 exam. Because the Department's promotion decisions departed from a strict rank order approach, the Department submitted an explanation to the Division for its decisions, as is required by law, Mass. Gen. Laws ch. 31, § 27. The Department explained to the Division that the Department believed that the departure was necessary in order "to ensure compliance with current EEOC guidelines, and applicable federal and state discrimination laws." Am. Compl. Ex. B. The Division, believing that the Department's explanation for the departure was premised on an incorrect assumption that the

---

4. The Division places all applicants who pass a particular civil service exam on an "eligibility list." From the eligibility list, the Division places 2n + 1 candidates, with n representing the number of positions requisitioned by the particular agency, on a "certified list." It is from this certified list that the particular agency is to draw in making selection decisions and, with few exceptions, the agency is to proceed in strict numerical or rank order in making such decisions, selecting those who scored highest on the exam downward until

the desired number of selections is made. Callahan Aff. ¶¶ 3–7.

5. The four-fifths rule specifically provides that "A selection rate for any race ... which is less than four-fifths (or eighty percent) of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact, while a greater than four-fifths rate will generally not be regarded by Federal enforcement agencies as evidence of adverse impact." 29 C.F.R. § 1607.4(D).

Department was still bound by a consent decree between MAMLEO and the City that had expired in 1995 which explicitly required the City to comply with the EEOC Guidelines, rejected this departure from strict rank ordering. *Id.* Ex. D.

Because the Department had already made the promotion decisions that were now being challenged by the Division, it was loathe to alter its decision in a way that would require it to rescind offers of promotion already made. Accordingly, the Department responded to the Division's objection by requisitioning from the Division six additional sergeant positions, so that the Department could promote the five officers who scored 85 on the 1996 exam who were bypassed under the original proposal, Evans Aff. ¶ 8, and one officer who was originally bypassed for cause, Callahan Aff. at 4 nn.1–2, while maintaining the promotional status of the Black Officers, Am. Compl. Ex. G. This yielded a total of 36 new sergeants, 32 of whom were white, four of whom were black. Callahan Aff. ¶ 15. The Division did not object to this arrangement. *Id.* ¶ 14. Although the revised promotion arrangement technically proceeded in strict rank order, ten white officers who scored 84 were not promoted. Seven of those officers filed suit against the City and Hartnett, in his official capacity as Personnel Administrator for the Division.

Since the promotions at issue in this case, the Department has not relied on the 1996 exam to make any more promotions to the rank of sergeant. Callahan Aff. ¶ 16. Another exam was administered in 1998, *id.* ¶ 17, and all promotions to sergeant since the ones at issue here have proceeded in strict rank order, except for

bypasses for cause, which are usually for disciplinary reasons, Evans Aff. ¶ 13.

## IV. DISCUSSION

The parties do not dispute the facts as they are presented above. The Plaintiffs allege that the City improperly took account of race when it made its promotions decisions based on the 1996 exam. The City acknowledges that it took account of race in making the promotion decisions. According to the City, however, its use of race was constitutionally permissible, a limited and targeted method of achieving the City's compelling government interests. This Court is thus not charged with the responsibility of assessing conflicting factual accounts to determine whether, when construed most favorably to the non-moving party, the facts would permit a favorable ruling for that party (the typical trial court responsibility at the summary judgment stage). Rather, this Court must determine whether the reasons proffered by the City for its unmistakably race-conscious action are legally sufficient justifications.

Before turning to the merits of the Plaintiffs' Fourteenth Amendment claim, however, the Court addresses the question whether the Plaintiffs have standing to litigate this case in the first place.

### A. Standing

The first defense raised by the City is its argument that the Plaintiffs would not have been promoted even if the Department had not taken account of race in making the promotions, and thus they have no standing to complain of the Department's use of race. City's Mem. at 4–6 [Docket No. 92].[6] In support of this

---

6. This recently-filed memorandum appears to be the first time the City has raised the issue of standing. Because a challenge to a plaintiff's standing to pursue the case calls into question the jurisdiction of a federal court

over the subject matter of the action, *Raines v. Byrd,* 521 U.S. 811, 818, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997), however, the challenge may be raised by any party at any point

contention, the City states that had it not been allowed to consider race in making promotions to sergeant from the 1996 exam, then *no one* who scored 84 on the exam, including the Plaintiffs, would have been promoted. *Id.* at 5; Evans Aff. ¶ 12. Instead, the City would have promoted 30 officers in accordance with its original requisition, but would have proceeded in strict rank order, meaning that only those candidates who scored 85 or higher, and only some of those who scored 85, would have been promoted. City's Mem. at 5; *see also* Am. Compl. Ex. A (certified list in rank order). The Plaintiffs, who scored 84, would not have been promoted even under this strict rank order approach.

### 1. Standing Generally

Article III of the Constitution limits the power of the federal courts to actual cases or controversies. *See* U.S. Const. art. III, § 2. To give meaning to this otherwise open-textured provision, the Supreme Court has established three criteria that form the "irreducible constitutional minimum" that must be shown in order for a plaintiff to have standing:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citations and internal quotation marks omitted). The Court considers these three criteria in turn.

First, the Plaintiffs must show that they suffered injury in fact. In a case such as this, where a plaintiff alleges that a defendant accorded unequal treatment to the plaintiff on the basis of race while the plaintiff competed for a government benefit, injury in fact is established by showing "the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Northeastern Fla. Chapter of Associated Gen. Contractors v. City of Jacksonville*, 508 U.S. 656, 666, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993). In other words, the Plaintiffs need not show that they would have been promoted but for the race-consciousness of the Department in order to demonstrate that they suffered concrete, particularized injury. They "need only demonstrate" that they were "able and ready to [compete] and that a discriminatory policy prevent[ed] [them] from doing so on an equal basis." *Id.; see also Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 210, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) ("Adarand need not demonstrate that it has been, or will be, the low bidder on a Government contract. The injury in cases of this kind is that a discriminatory classification prevent[s] the plaintiff from competing on an equal footing.") (internal quotation marks omitted); *Wooden v. Bd. of Regents of Univ. Sys. of Ga.*, 247 F.3d 1262, 1279 (11th Cir.2001) ("[T]he Supreme Court's standing jurisprudence in this area unmistakably turns the focus away from ... *result-oriented* analysis and toward a *process-oriented* analysis that asks wheth-

during the litigation, and may in fact be raised by a court sua sponte, Fed.R.Civ.P.

12(h)(3).

er the plaintiff has actually been *exposed* to unequal treatment.").

■ Here, the Plaintiffs took a civil service exam in good faith, aspiring to become sergeants. They indicated that they would accept the promotion if they were chosen. Am. Compl. Ex. A. By the objective measure of qualification for the job of sergeant, they were identical to the Black Officers. But they were not considered for promotion because they were not black. This is the heartland of cognizable injury in a discrimination case. The Plaintiffs were not allowed to compete on an equal footing with the Black Officers because of their race. This is a sufficiently concrete, particularized, and personal injury to satisfy the first criterion of constitutional standing.

■ The second criterion of constitutional standing, causation, follows easily once injury in fact is defined correctly in a discrimination case. Due to the Department's decision to select three officers who scored 84 for promotion because of their race, ten other officers who also scored 84 were denied the opportunity to compete on an equal, race-neutral footing. There can be no doubt that the Department's actions, as opposed to the actions of some intervening third party, caused the Plaintiffs' inability to compete on an equal basis with the Black Officers.

■ To satisfy the third requirement of standing, redressability, the Plaintiffs need not show that they would have been promoted in the absence of the alleged discrimination. Instead, a plaintiff need only show that it is likely, as opposed to speculative, that a favorable ruling will redress the plaintiff's injury. *Lujan,* 504 U.S. at 561, 112 S.Ct. 2130. To hold that Plaintiffs must show that they would have been promoted in the absence of racial considerations would collapse the standing inquiry in discrimination cases into a judgment on the merits of the case, and would

require the plaintiff to demonstrate a winning case on the issues of causation and damages just to get through the courthouse doors. *See Wooden,* 247 F.3d at 1280. A contrary ruling would also eviscerate the Supreme Court's careful definition of injury in fact in discrimination cases, and replace it with a standard the Supreme Court has explicitly rejected. *Adarand,* 515 U.S. at 211, 115 S.Ct. 2097; *City of Jacksonville,* 508 U.S. at 666, 113 S.Ct. 2297. All the Plaintiffs need show at this point is that a favorable ruling—a ruling that the City engaged in race-conscious decision making that is either not justified by a compelling interest or not narrowly tailored to achieve that interest—would redress their legal injury. If the Court were so to rule, the Plaintiffs would be allowed to compete in future rounds of promotions on an equal footing with other officers without regard to race. The Plaintiffs' injury, properly understood, is thus redressable by a favorable ruling on the merits.

The City relies principally on two cases, one from the Supreme Court, one from the District of Massachusetts, for the proposition that the Plaintiffs must show that they would have been promoted in the absence of improper consideration of race by the City in order to have standing to proceed. In *Texas v. Lesage,* 528 U.S. 18, 120 S.Ct. 467, 145 L.Ed.2d 347 (1999) (per curiam), the Supreme Court held that "even if the government has considered an impermissible criterion in making a decision adverse to the plaintiff, it can nonetheless defeat liability by demonstrating that it would have made the same decision absent the forbidden consideration." *Id.* at 20–21, 120 S.Ct. 467. In *Lesage,* the Supreme Court granted summary judgment to the University of Texas against an unsuccessful applicant to the University's graduate school of education who sought damages based on the University's consideration of

race in admitting and rejecting applicants. The University admitted that it considered race in making admissions decisions, but argued that Lesage, who ranked below 73 of the 223 applicants for 20 spots in terms of grades and GRE scores, would not have been admitted even if the University had been barred from considering race. *Id.* at 19, 120 S.Ct. 467.

*Lesage* is not instructive on the issue of standing, but instead addresses how a defendant in a discrimination case may defeat liability *on the merits* even though the plaintiff has shown that the defendant impermissibly considered race in making the challenged decision. The Supreme Court did not mention standing specifically in *Lesage.* Instead, the Supreme Court referenced *Mount Healthy City Board of Education v. Doyle*, 429 · U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), a case in which the Supreme Court held that a defendant may defeat liability on the merits for a constitutional violation (in that case, terminating the plaintiff for engaging in protected speech) by showing by a preponderance of the evidence that the same decision* would have been made in the absence of the constitutional violation, *id.* at 285–87, 97 S.Ct. 568. *Lesage*, 528 U.S. at 20–21, 120 S.Ct. 467. *Mount Healthy* addresses the issue of causation in constitutional tort cases. It permits the defendant to show that legitimate as opposed to impermissible factors were the principal cause of the plaintiff's harm. *Mount Healthy*, and accordingly *Lesage*, do not address the question whether the Plaintiffs have made the threshold showing that they may bring a suit in the first instance. *See Saunders v. White*, No. Civ. A. 99–2807(RCL), 2002 WL 338744, at *12 n. 21 (D.D.C. Mar. 4, 2002) (observing several problems with the approach of other courts to equate *Lesage* with standing, specifically that *Lesage* does not mention standing explicitly and that such an approach "unnecessarily conflates the standing inquiry with the actual merits

the plaintiff's claim"). *But see Wooden,* 247 F.3d at 1277 (suggesting that, in spite of the absence of reference to standing in *Lesage,* the decision "plainly bears on that [kind of] inquiry"); *Boston's Children First v. Boston Sch. Comm.,* 183 F.Supp.2d 382, 393 (D.Mass.2002) (Stearns, J.) ("If the result would have been the same, regardless of the plaintiff's race ... [t]he plaintiff ... would lack standing."). The Court therefore rejects the argument that *Lesage* compels a denial of *standing* to a plaintiff who cannot conclusively show that, absent the impermissible government action, he or she would have received the government benefit sought.

The City also relies upon *Donahue v. City of Boston,* 183 F.Supp.2d 202 (D.Mass.2001) (Tauro, J.), a case in which the court dismissed on standing grounds a claim of reverse discrimination brought by a white applicant to become an officer of the Boston Police Department, based on the fact that during one round of hiring, "the Department would have had to consider 586 applicants ahead of Donahue for thirteen spots," while during a second round of hiring "the Department would have had to consider 117 candidates for ... seven spots before it reached Donahue." *Id.* at 209.

*Donahue* is distinguishable from the facts of this case. In *Donahue,* the court denied standing to a competitor for a government benefit, even though the defendant admitted that it took account of race in making· its decisions, because the plaintiff "was eliminated from possible appointment before race ... was a factor." *Id.* at 208–09. In other words, Donahue was not denied the opportunity to compete on an equal footing with those of all races. He simply was eliminated from the competition before the competition became unequal. He thus did not suffer the kind of

injury that discrimination lawsuits are designed to redress.

*Donahue* resembles *Wooden* insofar as *Wooden* denied standing to one plaintiff who challenged the University of Georgia's admittedly race-conscious admissions policy because that particular plaintiff was denied admission solely on the basis of grades and test scores, before the plaintiff even reached the stage of admissions decisions where race was taken into account, *Wooden,* 247 F.3d at 1281–83. *See Donahue,* 183 F.Supp.2d at 208–09 (likening Donahue's circumstances to those of the Davis plaintiff in *Wooden* ). *Donahue* also resembles a recent Sixth Circuit decision, *Aiken v. Hackett,* 281 F.3d 516 (6th Cir. 2002), where that court ruled that plaintiffs, who were not among a group of white police officers who were "bumped" in order to promote black officers out of rank order to sergeant, lacked standing to litigate an antidiscrimination case. In *Aiken,* the court stated that it was "beyond debate" that the plaintiffs would not have been promoted to sergeant in the absence of an affirmative action program, because the plaintiffs' "composite scores (not the City's affirmative action program) kept them from being promoted." *Id.* at 519–20.

These cases—*Donahue, Wooden,* and *Aiken*—do not resemble this case. The plaintiffs in those cases were so clearly out of the running for the government benefits they sought that race never became an issue in their competition. Here, the Plaintiffs were on the cusp of being promoted to sergeant. They obtained the exact same score on the 1996 exam that the Black Officers obtained. Had the Department been forced to proceed in a strictly race-neutral fashion, it is possible that the Department, in pursuit of more promotions of black officers to sergeant, would have promoted all the candidates who scored 84 on the 1996 exam, includ-

ing the Plaintiffs. This is especially so given the fact that the Department informed the original 30 officers who were promoted of their promotions *before* explaining its departure from strict rank order to the Division and readjusting its promotion plan in response to the Division's objections. *See* Evans Aff. ¶ 8. Rather than rescind offers of promotion it made to some of those officers upon learning of the Division's objection to the Department's promotion decisions, the Department simply requisitioned more sergeant positions. *Id.;* Callahan Aff. ¶ 15. It is thus possible that, had the Department been forced to ignore race altogether, it would have requisitioned enough sergeant positions to promote everyone who scored 84 or better, in order to maintain the promotion status of the Black Officers, but in a completely race-neutral fashion. This would have allowed the Department to promote four black officers to sergeant, rather than just one, even if it meant promoting an additional 10 non-black police officers to sergeant. And, of course, this would have led to the promotion of the Plaintiffs.

For these reasons, the Court is satisfied that the Plaintiffs have made the requisite showing under *Lujan* that they have standing to litigate this case.

### 2. Standing to Seek Injunctive Relief

MAMLEO asserts that Plaintiffs lack standing to seek injunctive relief. Relying upon *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), MAMLEO argues that the Plaintiffs have made no showing that they will be affected by the allegedly unlawful conduct of the City in the future, as is required for a plaintiff to have standing to seek injunctive relief. MAMLEO's Mem. at 20 [Docket No. 108].

■ In order to have standing to seek injunctive relief, a plaintiff must not only satisfy the requirements of standing outlined in *Lujan,* but must also establish a "real and immediate threat" that the alleged wrongful conduct will be perpetrated by the defendant against the plaintiff again in the future. *Lyons,* 461 U.S. at 105, 103 S.Ct. 1660; *see also Blake v. Southcoast Health Sys., Inc.,* 145 F.Supp.2d 126, 132–34 (D.Mass.2001) (applying *Lyons* ). In *Lyons,* the plaintiff was injured after being placed in a control choke hold by members of the Los Angeles Police Department during a routine traffic stop. The plaintiff sought injunctive relief against further use of the choke hold by the Department except in cases where the target of the choke hold threatened immediate use of deadly force. The Supreme Court held that the plaintiff lacked standing to seek injunctive relief, explaining that in order to have such standing the plaintiff

> would have had not only to allege that he would have another encounter with the police but also to make the incredible assertion either (1) that *all* police officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter, whether for the purpose of arrest, issuing a citation, or for questioning, or (2) that the City ordered or authorized police officers to act in such a manner.

*Id.* at 105–06, 103 S.Ct. 1660. Because the plaintiff failed to make such a showing, the Supreme Court denied standing to the plaintiff to seek injunctive relief.

■ In this case, however, the Plaintiffs make out the requisite showing to seek an injunction against future consideration of race by the Department in making promotions. The Plaintiffs' counsel represents that the Plaintiffs have taken and will continue to take future civil service exams in pursuit of promotion to sergeant. Pls.' Opp'n to City's Mem. at 5 [Docket No. 111]. In continuing to seek promotion to sergeant, the Plaintiffs may be exposed to the same of kind of deliberate decision on the part of the Department to treat candidates differently because of their race. To be sure, the City states that all promotions since the ones at issue here have proceeded in strict rank order. Evans Aff. ¶ 13. But this is no guarantee that future promotion decisions, particularly those where the candidates have identical exam scores, will not be made on the basis of race. Police Commissioner Paul F. Evans stated during a deposition that he alone makes determinations regarding what percentage of minority officers at all ranks represents meaningful diversity on the force. Freidel Aff. Ex. 2, at 82–83 (Deposition of Paul F. Evans, day two) [Docket No. 142]. He also stated that he believes he has complete discretion to choose among candidates for promotion with identical scores on the exam. *Id.* at 84. Given this state of affairs, it is reasonable to expect that in the future the Plaintiffs might obtain a score on a promotion exam identical to candidates of other races, and yet be denied promotion while candidates of other races are promoted. The Commissioner has stated that it is his prerogative to exercise what he believes to be lawful discretion vested in him to achieve what he decides is an appropriate racial balance within the sergeant ranks. At the very least, it may be said that the Plaintiffs will take the test again in the future and may participate in a competition in which they are not on an equal footing with candidates of other races. In short, they face the kind of real and immediate threat of injury that antidiscrimination law is designed to redress. They thus may pursue equitable as well as legal relief.

**B. Permissibility of the Promotions Under Strict Scrutiny**

■ The parties are in agreement that the City's actions in making pro-

motions on the basis of race are subject to strict scrutiny. *Adarand,* 515 U.S. at 227, 115 S.Ct. 2097; *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 493–94, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). This is true regardless of the race of the party singled out by the classification, and regardless of whether the race singled out is burdened or benefitted by the classification. *Croson,* 488 U.S. at 494, 109 S.Ct. 706 ("[T]he standard of review under the Equal Protection Clause is not dependent on the race of those burdened or benefitted by a particular classification."). Once government action is subject to strict scrutiny, it is incumbent upon the government to demonstrate that the action is supported by a compelling government interest, and that the action is narrowly tailored to further the compelling interest. *Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 274, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986). This burden upon the government, however, is "merely one of production." *McLaughlin v. Boston Sch. Comm.,* 938 F.Supp. 1001, 1010 (D.Mass.1996) (Garrity, J.). At all times, the burden of persuasion rests upon the Plaintiffs to show that the promotion decisions were unconstitutional. *Wygant,* 476 U.S. at 277–78, 106 S.Ct. 1842; *id.* at 292–93, 106 S.Ct. 1842 (O'Connor, J., concurring).

### 1. Compelling Interests

The City and MAMLEO proffer three interests they claim are compelling that were furthered by the promotion decisions at issue in this case. First, the City argues that the promotion decisions helped to effectuate the "operational needs" of the Department by ensuring a diverse police force, which is necessary in order to serve a community as diverse as Boston and which, according to the City, has been partly responsible for the precipitous drop in crime in Boston over the past decade. City's Mem. at 7–13. Second, the City and MAMLEO contend that the promotion de-

cisions were necessary in order to remedy past discrimination within the Department. *Id.* at 17; MAMLEO's Mem. at 7–8. Finally, and related to the second justification, both the City and MAMLEO assert that the promotion decisions were required in order to stave off a lawsuit the City claims would have been brought by MAMLEO or disgruntled minority officers had the City promoted only one black officer out of a sergeant class of 30. City's Mem. at 17–18; MAMLEO' Mem. at 16–17.

Before examining each of these justifications individually to determine whether they are compelling, the Court offers a few general observations about compelling interests. The Supreme Court has offered little guidance on what constitutes such an interest. As the First Circuit observed in *Wessmann v. Gittens,* 160 F.3d 790 (1st Cir.1998):

> [W]e know that [race-conscious] state action is acceptable upon a showing … that it is needed to undo the continuing legacy of an institution's past discrimination. We also know that the [Supreme] Court has rejected the "role model" theory as a compelling interest. Beyond these examples, the case law offers relatively little guidance.

*Id.* at 795 (citations omitted). To these guideposts may be added the principle that "an effort to alleviate the effects of societal discrimination is not a compelling interest." *Shaw v. Hunt,* 517 U.S. 899, 909–10, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996). But that is all the help this Court has from above.

The Supreme Court has never held, however, that remedying past discrimination is the *only* interest that may be considered compelling, even though some justices have suggested as much, *e.g., Croson,* 488 U.S. at 493, 109 S.Ct. 706 (O'Connor, J.) ("Unless [racial classifications] are strictly reserved for remedial settings,

they may in fact promote notions of racial inferiority and lead to a politics of racial hostility."). The First Circuit, like other courts, has declined to hold that interests not linked to remedying past discrimination may never be compelling, in the absence of a directive from the Supreme Court to do so. *Wessmann*, 160 F.3d at 795–96; *see also Wittmer v. Peters*, 87 F.3d 916, 919 (7th Cir.1996) ("A judge would be unreasonable to conclude that no other consideration except a history of discrimination could ever warrant a discriminatory measure unless every other consideration had been presented to and rejected by him."). As such, this Court will not reject categorically non-remedial justifications for the Department's race-conscious decision. Instead, the Court must examine the particular justifications submitted by the City and make a legal determination about whether they are compelling in light of the unique circumstances of the Boston Police Department. *See Wessmann*, 160 F.3d at 798 (observing that when a court considers whether a particular interest asserted by the government is compelling, "the devil is in the details").

▮ Additionally, in order for an interest proffered by a defendant to warrant consideration as a compelling interest, it must be an interest that actually motivated the defendant in making the decision at issue. As the Supreme Court stated in *Shaw v. Hunt*, "a racial classification cannot withstand strict scrutiny based upon speculation about what may have motivated the [decision maker]. To be a compelling interest, the State must show that the alleged objective was the [decision maker's] *actual* purpose for the discriminatory classification." 517 U.S. at 908 n. 4, 116 S.Ct. 1894 (emphasis added) (internal quotation marks omitted). This requirement is consistent with the purpose of strict scrutiny, which is to "smoke out" the reasons why the government took the actions it did, in order to determine whether those

reasons justify government consideration of race. *Croson*, 488 U.S. at 493, 109 S.Ct. 706; *cf. Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 729–30 & n. 16, 744, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (rejecting defendant's proffered justification of remedying discrimination against women in the nursing industry as the "actual purpose" for the state's all-female nursing school, because evidence suggested that almost all nurses within the state were female, and thus females were not discriminated against in the nursing industry). A defendant may not submit a *post hoc* rationalization for its race-conscious action where it is clear that such a justification never crossed the decision maker's mind at the time the decision was made. *See United States v. Virginia*, 518 U.S. 515, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) ("The justification [for a government classification] must be genuine, not hypothesized or invented *post hoc* in response to litigation.").

Nevertheless, upon this record the Court rejects the Plaintiffs' suggestion that the only interest considered by the City at the time the promotions were made was the one articulated by the Department's Director of Human Resources, Edward P. Callahan, in a letter he sent to the Division explaining the Department's departure from strict rank order in promoting the Black Officers—namely the desire to comply "with current EEOC guidelines, and with applicable federal and state discrimination laws," Am. Compl. Ex. B. *See* Pls.' Opp'n to City's Mem. at 8–10, 14–16 (arguing that this is the only interest that may be considered by the Court). When Commissioner Evans was asked at a deposition what his reasons were for promoting the Black Officers to the exclusion of the white officers with the same score on the 1996 exam, he replied, "[a]dverse impact, a diversity at the higher ranks, and to help achieve community policing." Friedel Aff. Ex. 1, at 48 (Deposition of Paul F. Evans,

day one).[7] Evans also stated in a signed report dated July 13, 2001, that when he made the promotions at issue, he did so "to avoid adverse impact under the EEOC Guidelines 'four-fifths rule,' . . . and to ensure that the Department had a sufficient number of minority sergeants to execute its mission of community policing." Evans Decl. Ex. A, at 3 [Docket No. 96]. In the Court's view, the Plaintiffs have failed to create a genuine dispute about that fact that the City did consider its operational needs prior to promoting the Black Officers, and the Court will therefore examine that justification for the City's action to determine whether it constitutes a compelling interest.

### a. Operational Needs

The first interest articulated by the City as a justification for its consideration of race in promoting the Black Officers is an interest in sustaining the "operational needs" of the Department. More specifically, the City argues that meaningful minority representation within the Department, including at the sergeant level, helps to foster cooperation between police officers and members of the diverse communities they serve, and therefore allows the Department to protect and serve these communities more effectively. The Boston model of "community policing," in which the Department works with members of

various communities to enhance crime prevention measures, offer young people alternatives to criminal activity, and protect communities against hardened criminals, would be in jeopardy, according to the Department, if it was forbidden to consider race in making promotion decisions, at least where the candidates are otherwise equally qualified. *E.g.,* Evans Decl. Ex. A, at 14. The Court explores the City's argument in greater detail below.

In 1990, crime in Boston reached an all-time high. The City faced a record 152 homicides, almost half of which were youth homicides. McDevitt Decl. Ex. A, at 7 (Expert Report of Jack McDevitt) [Docket No. 97]. Many of these homicides were concentrated in areas heavily populated by minorities, such as Roxbury, Dorchester, and Mattapan. *Id.* In response, the City implemented a number of measures designed to work with these and other communities, in order to bolster public trust in and cooperation with police officers who were patrolling those communities. These measures included giving more power to officers at the beat and precinct level in order to give them greater flexibility to address the unique concerns of their communities, *id.* at 9; assigning officers to particular beats or neighborhoods on a permanent basis, so that officers could get to know and develop a rapport with members of that community, *id.* at 10; and

---

7. In the same portion of the deposition, Commissioner Evans, when asked if the need to increase diversity at the sergeant level prompted him to make the promotions at issue here, replied, "Yeah, I probably believed that, but the major reasons was the adverse impact, to avoid adverse impact." Freidel Aff. Ex. 1, at 46. Evans also stated that his "major purpose in promoting them was to avoid adverse impact and to have [the 1996 exam] challenged. There may have been secondary issues of increasing diversity at that but they were not my major purpose in promoting." *Id.* at 47. The Plaintiffs suggest that these statements mean that diversity was

not actually considered by the Department at the time the decisions were made. Pls.' Opp'n to City's Mem. at 15. These statements do not impugn the City's claim that diversity was a consideration when the promotion decisions were made. The Commissioner's statement that he "probably" rather than unequivocally considered diversity does not mean that he did not consider such an interest, particularly in light of the remainder of his deposition testimony. And there is certainly no legal reason why a secondary, as opposed to a primary, motivation for taking race-based action may not be offered in defense of a race-conscious decision.

creating a system of "collaboration among neighborhood residents, community, patrol officers, supervisors, members of the business community, clergy, service providers, academic institutions as well as state and federal law enforcement officials," *id.*

The results have been phenomenal. The homicide rate in Boston dropped from 152 in 1990 to 31 in 1999, *id.* at 12, its lowest level since 1961, Evans Decl. Ex. A, tab C, at 1 (City of Boston, *1999 Crime Summary Report* ) [Docket No. 96]. Overall serious crime in Boston has been reduced by 48% since 1990. *Id.* Citizen complaints against Boston police officers decreased by 55 percent from 1993 to 1997. McDevitt Decl. Ex. A, at 15. To be sure, some of the decrease in crime and in complaints against police officers is no doubt due to other factors, such as the national economic boom experienced during this time. But the community policing model, which focuses on getting the entire community involved in preventing and fighting crime, deserves at least some of the credit for these numbers.

Police Commissioner Evans insists that the success of community policing depends on the ability of the Department to garner the trust of the citizens it serves. Evans Decl. Ex. A, at 5 (Report of Paul F. Evans); *see also* McDevitt Decl. Ex. A, at 6. In Commissioner Evans's opinion, "[a] critical component of developing trust, cooperation, and respect is ensuring diversity among the ranks of the Department." Evans Decl. Ex. A, at 5. This is due to the fact that "when members of the community [can] see themselves among the ranking police officers, they beg[in] to be willing to work with us, rather than against us." *Id.* at 13. The Department depends on citizens to provide them with information about criminal activity within their neighborhood, assist in identifying offenders, and testify in court to convict these offenders, as well as to identify young persons who could benefit from services in order to be steered away from criminal activity. McDevitt Decl. Ex. A, at 13, 18, 24. Beyond helping to establish trust with a diverse community, a diverse police force helps further the law enforcement goals of the Department. "For example, if there is an African American drug distribution network developing in a community, an African American officer, acting in an undercover capacity, is much more likely to be able to develop intelligence about the drug dealers involved than a white undercover officer could." *Id.* at 24.

The City argues that diversity is necessary to further its operational needs not only at the police officer level, but all the way up the ranks of the Department. "If [the Department] has a representative percentage of minority members but very few of those members have ever been promoted to a position of command or leadership the message sent back to the community is that the organization values diversity but only in certain roles, not in leadership positions." *Id.* at 25. Diversity at high levels of the Department may also be important to help mediate disputes between members of the community and officers on the beat, "particularly those that involve [minorities]." *Id.* at 26.

 This Court understands the City's need to fight crime and maintain fruitful relationships with the communities served by the Department. The Court is also aware that some courts have been particularly receptive to diversity-based arguments in the law enforcement context. *E.g.*, *Wessmann,* 160 F.3d at 795; *Wittmer,* 87 F.3d at 919 (collecting cases). Ultimately, however, the Court cannot accept the City's argument that operational needs justify race-conscious decision making on the part of the Department for the indefinite future.[8]

---

**8.** The City, which has claimed its right to a jury trial from the inception of this litigation,

The City's argument rests on the cynical assumption that members of a particular race will only cooperate with members of their own race. Commissioner Evans's report suggests that only when a sufficient number of minorities are on the police force will certain communities "be willing to work with us, rather than against us." Evans Decl. Ex. A, at 13. Such a policy invites the emergence of a divisive kind of racial politics between communities and the Department, as members of any race might threaten not to cooperate with the Department unless they see representation within the Department roughly proportional to that racial group's percentage of the population of Boston generally. *Cf. Wittmer*, 87 F.3d at 920 (rejecting contention that "prison authorities are entitled to yield to extortionate demands from prisoners for guards of their own race"). This kind of divisiveness, fostered by divvying up government benefits along racial lines, is what cases interpreting the Equal Protection seek to avoid. *E.g., Croson*, 488 U.S. at 493, 109 S.Ct. 706 (expressing concern that non-remedial racial classifications will "lead to a politics of racial hostility").

Additionally, the policy sends a message to officers within the Department that they are nothing more than a product of their race. It relies upon crude stereotypes about how members of the same race act around one another, and how they act around members of other races. It suggests that the valued unit of measurement in the Boston Police Department is the group, rather than the individual. These are impermissible considerations for a government body to entertain. *E.g., Miller v. Johnson*, 515 U.S. 900, 912, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995) ("Race-based [decision making] embod[ies] stereotypes that treat individuals as the product of their race, evaluating their thoughts and efforts—their very worth as citizens—ac-

---

argues that it has the right to a jury's determination of this issue.

Not so. What constitutes a compelling interest is matter of law. *See, e.g., Wygant*, 476 U.S. at 274–76, 106 S.Ct. 1842 (rejecting, as matter of law, remedying societal discrimination and providing role models to young minorities as compelling justifications for race-conscious action); *Wessmann*, 160 F.3d at 795 ("[B]ecause the issues advanced in this appeal—specifically, whether diversity and curing vestiges of past discrimination satisfy strict scrutiny—raise either questions of law or questions about how the law applies to discerned facts, our review is essentially plenary."). True, the particular *contours* of a compelling state interest arise from a discrete factual context. Here, the Court has followed traditional summary judgment jurisprudence and drawn all reasonable inferences from the undisputed facts in *favor* of the City, ruling nevertheless that the City's proffer as to operational needs falls short.

Even had the proffer presented a closer question, however, it is important to note that this Court would nevertheless proceed itself to evaluate the situation and initially make the determination whether the operational needs of the Department constitute a compelling state interest. Such a determination involves a consideration of what are known as "legislative facts"—those facts which themselves determine the legal rule, rather than "adjudicative facts"—those facts which determine whether an established legal rule applies in a particular instance. *See* Fed.R.Evid. 201(a) advisory committee's note (distinguishing legislative from adjudicative facts). As such, this determination is one for the Court to make, not the jury. *Id.* ("In determining the content or applicability of a rule of domestic law, the judge is unrestricted in his investigation and conclusion. He may reject the propositions of either party or of both parties. He may consult the sources of pertinent data to which they refer, or he may refuse to do so. He may make an independent search for persuasive data or rest content with what he has or what the parties present. . . . [T]he parties do no more than assist; they control no part of the process.") (quoting Edmund M. Morgan, *Judicial Notice*, 57 Harv. L.Rev. 269, 270–71 (1944)). Such an approach, of course, carries with it the benefit of plenary review by higher courts. *Wessmann*, 160 F.3d at 795.

cording to a criterion barred to the Government by history and the Constitution.") (internal quotation marks omitted).

Finally, there is no logical stopping point to the Department's justification. Presumably, the Department will always have an interest in having a diverse police force to serve a diverse community. Therefore, there will always be an incentive for the Department to take account of race if such a justification is held to be compelling, to make sure that the racial makeup of the Department matches the racial makeup of the City. This is an unconstitutional end for a government policy. *E.g., Wittmer*, 87 F.3d at 920 (rejecting proposition that government "would have been entitled to take steps to make the racial composition of the security staff mirror that of the inmate population."). All the Department would have to show is that diversity within the Department continues to lead to police-community cooperation, and it would be given carte blanche to continue making race-based decisions. It would permit race-conscious remedies that are "ageless in their reach into the past, and timeless in their ability to affect the future." *Wygant*,

476 U.S. at 276, 106 S.Ct. 1842. This justification thus offends the principle that, because remedies for equal protection violations usually involve treating people unequally, such remedies should be limited in scope and in duration. *See Croson*, 488 U.S. at 498, 109 S.Ct. 706. Because the operational needs justification has no such built-in limitation, it could be used to justify race-conscious decision making indefinitely, which has in the past been the reason why other proffered interests have been rejected by the Supreme Court. *See Wygant*, 476 U.S. at 275–76, 106 S.Ct. 1842 (rejecting the role model theory and societal discrimination as compelling interests for this reason).

For these reasons, the Court rejects the City's "operational needs" defense as a compelling justification for its admittedly race-conscious action.[9]

#### b. Remedying Past Discrimination

The second interest proffered by the City and MAMLEO as a justification for the promotion decisions at issue is an interest in remedying current vestiges of past discrimination by the Department

---

9. At a hearing on January 10, 2002, the Court suggested that another reason to reject the City's interest in effectuating its operational needs was a provision of the Massachusetts General Laws prohibiting unfair treatment within the state civil service on the basis of race. Mass. Gen. Laws ch. 31, § 1. The Court recognizes that if "operational needs" is a compelling interest in the constitutional sense, state law concerns would be irrelevant, as the Department's duty to comply with the federal Constitution would conflict with, and thus preempt, the state law obligation to assure fair treatment without regard to race. *See, e.g., Bowe v. Sec'y of the Commonwealth*, 320 Mass. 230, 245, 69 N.E.2d 115 (1946) ("When one party relies on some provision of a statute, and the other relies on some provision of the higher law of the Constitution, with which ... the statute conflicts, ... [the court's] duty is to apply the higher law of the Constitution, and disregard the statute.").

Because the government has a clear duty to remedy vestiges of past discrimination, *Wygant*, 476 U.S. at 277, 106 S.Ct. 1842, for example, such a duty overrides state law concerns regarding unfair treatment on the basis of race within the civil service.

For the reasons outlined in this opinion, however, the Court rejects operational needs as a compelling interest on its own terms. Neither the Supreme Court nor the First Circuit has suggested that a government body has a constitutional mandate to further its own operational needs. In the absence of a clear directive from either of these courts to recognize such a mandate, it would be imprudent to create one out of whole cloth, particularly where it would contravene the clearly-articulated policy of the elected legislature of this Commonwealth to proscribe unfair treatment within the state civil service on the basis of race.

against black applicants and officers. City's Mem. at 14–17; MAMLEO's Mem. at 7–16. Well understanding that such an interest has been recognized by the Supreme Court as compelling under certain circumstances, *e.g.*, *Shaw v. Hunt*, 517 U.S. at 909, 116 S.Ct. 1894; *Wygant*, 476 U.S. at 277, 106 S.Ct. 1842, the City and MAMLEO amass evidence, all of it uncontested by Plaintiffs, to show that remaining vestiges of prior discrimination perpetrated by the Department against blacks justify the limited race-conscious action taken by the Department in this case. After setting out the contours of remedying past discrimination as a compelling interest, the Court considers the undisputed evidence.

In order for a government interest in remedying past discrimination to rise to the level of a compelling justification for race-conscious action, two conditions must be satisfied: "First, ... States ... must identify that [past] discrimination ... with some specificity before they may use race-conscious relief.... Second, the institution that makes the racial distinction must have had a strong basis in evidence to conclude that remedial action was necessary, *before* it embarks on an affirmative-action program." *Shaw v. Hunt*, 517 U.S. at 909, 116 S.Ct. 1894 (citations and internal quotation marks omitted).

With respect to the first condition, the Court is satisfied that the City and MAMLEO have identified the past discrimination to be remedied with the appropriate degree of specificity. They identify the relevant past discrimination as that committed by the Boston Police Department, rather than, for example, discrimination in Boston generally or in police departments nationally, which would not satisfy the City's burden of showing that it had a "strong basis in evidence" for taking the action it did.

As to the second condition, the Court is satisfied preliminarily that the City concluded race-based action was necessary *before* it made the promotion decision. The Plaintiffs argue that the City never considered this rationale at the time of the decision, and should thus be barred from submitting this rationale now. *E.g.*, Pls.' Opp'n to City's Mem at 6; Pls.' Mem. at 9 [Docket No. 124]. For the reasons set out in the Court's discussion of the City's operational needs argument, *see supra* pp. 32–34, the Court holds that the Department believed the challenged promotions were necessary to remedy past discrimination before it made the decisions. Even if the Court is wrong as matter of undisputed fact, however, as matter of law the City's interest in complying with EEOC guidelines and state and federal discrimination law, which it clearly articulated at the time it made the promotion decisions, Am. Compl. Ex. B, permissibly implicates City's interest in remedying past discrimination. In *Boston Police Superior Officers Federation v. City of Boston*, 147 F.3d 13 (1st Cir.1998), the First Circuit rejected an argument identical to the one made here by the Plaintiffs. The court in *Superior Officers* dubbed "untenable" plaintiffs' argument that, because Commissioner Evans justified race-conscious action as necessary to comply with a consent decree then thought to be in force, he was not also acting to remedy past discrimination within the Department. 147 F.3d at 23. The First Circuit stated that "[compliance with the consent decree] so much implicates [remedying past discrimination] that Commissioner Evans, who stated in his affidavit that he was concerned with avoiding adverse impact on minority candidates, was undoubtedly pursuing both goals at once." *Id.*

The important question here is whether the Department had a "strong

basis in evidence" for its belief that race-conscious action was necessary. *Shaw v. Hunt*, 517 U.S. at 909, 116 S.Ct. 1894 (quoting *Wygant*, 476 U.S. at 277, 106 S.Ct. 1842). Such a strong basis in evidence may be demonstrated by "either 'a contemporaneous or antecedent finding of past discrimination by a court or other competent body,' or evidence 'approaching a prima facie case of a constitutional or statutory violation.'" *Superior Officers*, 147 F.3d at 20 (quoting *Wygant*, 476 U.S. at 289, 106 S.Ct. 1842, and *Croson*, 488 U.S. at 500, 109 S.Ct. 706). The City and MAMLEO rely on a combination of both, and submit that judicial determinations of discrimination by the Department in hiring and promoting blacks, combined with the adverse impact of the 1996 exam, establish the requisite strong basis in evidence to take race-based action to remedy such discrimination.

Before delving into the evidence submitted by the City and MAMLEO on this point, the Court resolves one more legal dispute. The Plaintiffs assert repeatedly that the City may not rely on "after-acquired" evidence to demonstrate the existence of past discrimination or adverse impact. *E.g.*, Pls.' Opp'n to MAMLEO's Mem. at 5 [Docket No. 113]; Pls.' Mem. at 4–5. To say that the particular interest articulated by the government must have been actually considered at the time the government made its decision, *see supra* pp. 31–32, is not to say that the government must have made findings that it actually discriminated prior to its decision to engage in race-conscious action. The former is a principle recognized by the Supreme Court; the latter is a principle expressly rejected by the Supreme Court. In Justice O'Connor's concurring opinion in *Wygant*, for example, she endorsed the holding of a plurality of the Court that "a contemporaneous or antecedent finding of past discrimination by a court or other competent body is not a constitutional pre-requisite to a public employer's voluntary agreement to an affirmative action plan." 476 U.S. at 289, 106 S.Ct. 1842 (O'Connor, J., concurring). The rationale for this principle is simple: if the government was required to develop statistical or other detailed evidence that it engaged in discrimination against blacks, for example, before it engaged in affirmative action designed to enhance opportunities previously denied to blacks, there would be no incentive for the government to take affirmative action, because to do so would require the government to expose itself to liability to the very individuals it is trying to help. *Id.* at 290, 106 S.Ct. 1842. This principle recognizes the delicate position of public employers, who are "trapped between the competing hazards of liability to minorities if affirmative action *is not* taken to remedy apparent employment discrimination and liability to nonminorities if affirmative action *is* taken." *Id.* at 291, 106 S.Ct. 1842.

Somewhere, then, between merely articulating an interest in remedying past discrimination and garnering enough evidence to make out a winning case of discrimination against itself, the government satisfies its burden of demonstrating that it had a "strong basis in evidence" for concluding that past discrimination warranted a race-based remedy. Once again, Justice O'Connor provides useful guidance for where exactly that somewhere might be in a case like this:

> [D]emonstrable evidence of a disparity between the percentage of qualified blacks on a school's teaching staff and the percentage of qualified minorities in the relevant labor pool sufficient to support a prima facie Title VII pattern or practice claim by minority teachers would lend a compelling basis for a competent authority such as the School Board to conclude that implementation of a voluntary affirmative action plan is

appropriate to remedy apparent prior employment discrimination.

*Id.* at 292, 106 S.Ct. 1842.

██ In making this showing, the government may rely on statistical or other evidence developed after it engaged in race-conscious action to bolster its claim that vestiges of past discrimination remained within the government body. *E.g., Eng'g Contractors Ass'n of S. Fla., Inc. v. Metro. Dade County,* 122 F.3d 895, 911–13 (11th Cir.1997); *Contractors Ass'n of E. Pa., Inc. v. City of Philadelphia,* 91 F.3d 586, 605 n. 21 (3d Cir.1996); *Concrete Works of Colo., Inc. v. City & County of Denver,* 36 F.3d 1513, 1520–21 (10th Cir. 1994); *Harrison & Burrowes Bridge Constructors, Inc. v. Cuomo,* 981 F.2d 50, 60 (2d Cir.1992); *Coral Constr. Co. v. King County,* 941 F.2d 910, 919–20 (9th Cir. 1991). In this case, as long as the Department had the requisite "strong basis in evidence" for believing that the promotion decision was necessary to remedy present vestiges of past discrimination within the Department, it may rely on evidence developed after the promotion was made to buttress such a claim during litigation. *Rothe Dev. Corp. v. United States Dep't of Defense,* 262 F.3d 1306, 1328 n. 21 (Fed. Cir.2001). With these legal principles in mind, the Court turns to the evidence of past discrimination within the Department.

The Court begins by taking notice of the many opinions of the First Circuit documenting the discrimination perpetrated in the past by the Boston Police Department against minorities.[10] Particularly instructive is the First Circuit's most recent examination of the state of affairs within the Department in *Boston Superior Officers*

*Federation v. City of Boston,* 147 F.3d 13 (1st Cir.1998). In *Superior Officers,* the First Circuit held that the Boston Police Department's decision to promote a black officer named Rafael Ruiz to the rank of lieutenant, even though Ruiz scored one point lower on a civil service exam than did three white officers who were not promoted, was justified by an interest in remedying past discrimination within the Department. In so holding, the court noted:

> [T]he [Department]'s history of racial discrimination is well-documented in the decisions of this court. In 1972, we affirmed a district court's finding that the BPD discriminated against black applicants through the use of entry-level testing procedures that favored whites. *Castro v. Beecher,* 459 F.2d 725 (1st Cir.1972). As we noted in *Castro,* that discrimination resulted in a gross racial disparity among the [Department]'s ranks: in 1970, only two percent of [Department] officers were black or Latino; by comparison, these groups constituted 16 percent of the general population.

> Nineteen years after *Castro,* this court in *Stuart* [*v. Roache,* 951 F.2d 446 (1st Cir.1991) ] again considered the evidence of past racial discrimination within the [Department] ... and saw little evidence of remedying the discrimination cited in *Castro.* 'Remedial action takes time,' we reasoned, 'and discrimination may linger for many years in an organization that had excluded blacks from its ranks.'

> The same logic dictates that the [Department]'s historic discrimination nega-

---

10. A federal district court may take judicial notice of adjudicative facts "at any stage" of litigation, in its own discretion, where the facts are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.

R.Evid. 201. The facts to be noticed are contained within the pages of the *Federal Reporter,* and their accuracy cannot reasonably be questioned. Should the Plaintiffs choose to challenge the Court's exercise of discretion in this regard, however, they may do so. *Id.*

tively affected the number of black lieutenants at the time of Ruiz's promotion. *Id.* at 20 (some citations omitted).

The Plaintiffs dispute the precedential force of *Superior Officers,* arguing that the case stands for the proposition that the Department is barred from relying upon its history of past discrimination to justify post-*Superior Officers* race-conscious promotions. *E.g.,* Pls.' Opp'n to City's Mem. at 12–13, 15; Pls' Opp'n to MAMLEO's Mem. at 4–5. The Plaintiffs rely on the court's statement in *Superior Officers* that its holding "is based strictly on the[ ] unique circumstances [of this case], and does not give the [Department] license to depart from strict rank order in future promotions." 147 F.3d at 25.

The Plaintiffs attempt to wring more from the words of *Superior Officers* than they will bear. To be sure, the First Circuit did suggest that the Department may not rely on its discriminatory past to justify affirmative action indefinitely. But to say that *Superior Officers* does not give the Department license to depart from strict rank order in the future does not mean that the case prohibits the Department from ever considering race in the future. In fact, as to the question whether the Department may depart from strict rank order in future rounds of promotions, the court in *Superior Officers* explicitly reserved judgment. *Id.* at 25 ("Whether any similar factors are left that might warrant future remedial action is a question that we need not now address.").

*Superior Officers* is useful principally for its documentation of the past discrimi-

natory history of the Department, which the First Circuit held was not "too temporally remote" to constitute part of the Department's evidentiary basis for concluding that race-conscious action was needed, *id.* at 20. The questions whether the Department had a strong basis in evidence for concluding that *present vestiges* of past discrimination remain that required a race-conscious remedy, and whether the Department's remedy was *narrowly tailored* to the interest asserted, are questions that the Department must answer anew in this case, and must answer anew in every case, to ensure that the Department refrains from using race in an open-ended way indefinitely.

 The Court now turns to the evidence presented by the City and MAMLEO that current vestiges of past discrimination existed in the 1996 exam that warranted a race-based solution. It is undisputed in this case that, had the Department promoted only 30 officers in strict rank order, 29 white officers and one black officer would have been promoted. Callahan Aff. ¶¶ 9, 11. Based on the number of black and non-black officers who passed the 1996 exam—33 and 192, respectively—the Department calculated at the time it made the promotion decisions that promoting 30 officers in strict rank order would yield a black/non-black selection percentage ratio of 20%. *Id.* ¶ 11 & Ex. B. According to the EEOC Guidelines "four-fifths" rule, a selection percentage ratio below 80%, or four-fifths, is evidence of adverse impact.[11] The Department had evidence, based on calculations it performed at the time it made the promotion

---

**11.** The Plaintiffs assert that the First Circuit in *Superior Officers* held that, because the consent decree between the Department and MAMLEO which required compliance with the four-fifths had expired, the four-fifths rule is no longer relevant to the determination of past discrimination. Pls.' Opp'n to MAMLEO's Mem. at 6–7. To the contrary, the First Circuit, despite holding that the Department was no longer bound by the consent

decree, observed that although violation of the four-fifths rule, "standing alone, is not conclusive evidence of discrimination ... [the rule] can ... properly serve 'as a benchmark against which ... to gauge [the City's] efforts to remedy past discrimination.'" *Superior Officers,* 147 F.3d at 21 (quoting *Local 28, Sheet Metal Workers' International Ass'n v. EEOC,* 478 U.S. 421, 478, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986)); *see also Albemarle Paper*

decisions, Callahan Aff. ¶ 11, that proceeding in strict rank order would have produced a black/non-black selection ratio that fell well below the 80% ratio required to avoid an inference of adverse impact.

 This gross statistical disparity between the selection percentage of black officers and the selection percentage of white officers, coupled with the documented history of past discrimination within the Department, created an adequate foundation for the Department to conclude that a departure from strict rank order was necessary. *See Superior Officers*, 147

F.3d at 21 (stating that a violation of the four-fifths rule, along with statistical evidence of underrepresentation of blacks at the lieutenant level, "reinforces the [Department's] conclusion that it had not yet succeeded in remedying the effects of its history of discrimination"). While this evidence might not alone have amounted to a winning Title VII case against the City by MAMLEO or minority officers, it would have presented enough evidence to make the prospect of losing a worthwhile concern for the City.[12] This evidence therefore constituted an adequate starting point for

---

*Co. v. Moody*, 422 U.S. 405, 431, 95 S.Ct. 2362, 45 L.Ed.2d 280 (stating that EEOC Guidelines, as the administrative interpretation of Title VII by the EEOC, are entitled to "great deference").

There are instances, particularly where the sample size is small, where use of the four-fifths rule is inappropriate. *Fudge v. City of Providence Fire Dep't*, 766 F.2d 650, 658 n. 10 (1st Cir.1985). This concern obtains only when the sample size is so small that a change in a single promotion decision—i.e., the decision to promote one more black officer and one fewer white officer—makes the difference between adverse impact and no adverse impact under the four-fifths rule. *Superior Officers*, 147 F.3d at 22 (distinguishing *Fudge*). In this case, as in *Superior Officers*, the sample size is sufficiently large that the four-fifths rule may serve as an appropriate benchmark against which to gauge adverse impact. *See* Rutkowski Aff. Ex. 14 ¶ 25 (Expert Report of James Medoff) (calculating that a single promotion change would not have made the difference between adverse impact and no adverse impact under the rule); Callahan Aff. Ex. B (same).

Because this is not a case in which the sample size is too small to make four-fifths rule calculations unreliable, the Court looks to the rule in the same way the First Circuit did in *Superior Officers:* as a helpful but not dispositive benchmark for determining adverse impact.

**12.** It is necessary at this point to explain why the violation of the four-fifths rule results in a potentially meritorious Title VII claim. Under Title VII, an employment selection procedure that adversely affects minorities can lead

to employer liability if it can be shown that an alternative selection procedure existed that yielded qualified applicants while resulting in less adverse impact on minorities. 42 U.S.C. § 2000e–2(k); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 431, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) ("[D]iscriminatory tests are impermissible unless shown, by professionally acceptable methods, to be predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are being evaluated.") (internal quotation marks omitted).

A prima facie Title VII adverse impact claim against an employer may be demonstrated in a number of ways. The Supreme Court has stated that a showing of "gross statistical disparities" between selection of minorities and non-minorities may alone indicate adverse impact. *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 307–08, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977). A violation of the four-fifths rule, even though it is generally considered a "rule of thumb," may demonstrate adverse impact, particularly when coupled with other statistical evidence of adverse impact. *See generally Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 995 n. 3, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988) (outlining ways in which adverse impact may be demonstrated, and declining to adopt any particular method as authoritative, approving instead of courts' case-by-case approach to determining adverse impact).

Once adverse impact is established, the burden of production shifts to the employer to show that the test has a "manifest relationship to the employment in question." *Albemarle Paper*, 422 U.S. at 425, 95 S.Ct. 2362

the Department to conclude, at the time it made the promotion decisions, that current vestiges of past discrimination remained and warranted remedial action.

But this is not the only evidence upon which the City and MAMLEO rely. In addition to a violation of the four-fifths rule, MAMLEO submits the expert reports of Dr. Kathleen K. Lundquist, an industrial psychologist who studied the ad-

verse impact of the 1996 exam in preparation for this litigation. Her reports show that the 1996 exam adversely impacted blacks vis-a-vis non-blacks, and that the difference between the black selection percentage and the non-black selection percentage is statistically significant under two different measures of statistical significance—"chi-square" and "Fisher's Exact Test".[13] Rutkowski Aff. Ex. 15 ¶¶ 9–14 &

(quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 432, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)). This includes a showing not only that the test validly distinguishes *between* passing and failing scores in terms of applicants' qualifications for the job in question, but also *among* passing scores, if the test is to be coupled with strict rank-order selection from the list of passing scores. *E.g., Guardians Ass'n v. Civil Serv. Comm'n*, 630 F.2d 79, 100–01 (2d Cir.1980) ("Permissible use of rank-ordering requires a demonstration of such substantial test validity that it is reasonable to expect one- or two-point differences in scores to reflect differences in job performance."). Because the 1996 exam was never content-validated, the City could not show, at least as the evidence currently stands, that the 1996 exam validly distinguished between passing and failing scores, much less among passing scores. Thus, had the City proceeded in rank order and been sued by MAMLEO or minority officers, it is quite possible that the City would have failed to meet its burden of production at this stage of the case, and would have thus been found to have violated Title VII.

Even if the City succeeded in showing that the test bore a close relationship to the skills sought in prospective sergeants, the would-be plaintiffs could still prevail by showing that other selection methods which have less adverse impact on minorities nonetheless meet the employer's objective of obtaining a qualified workforce. *E.g., Albemarle Paper*, 422 U.S. at 425. In such a case, the employer's failure to adopt the equally valid selection method that resulted in less adverse impact on minorities would be evidence that the employer's articulated reasons for relying upon the test are a pretext for discrimination. *Id.*

In this case, MAMLEO asserts that it has in the past recommended "banding" of test results—i.e., treating scores within a given range (such as 84 to 86) as functionally equiv-

alent for purposes of selecting among candidates—as an equally valid method of selecting among candidates that has less adverse impact on minorities. MAMLEO's Mem. at 14. Banding has been approved by a number of courts. *E.g., Superior Officers*, 147 F.3d at 24 n. 5; *Officers for Justice v. Civil Serv. Comm'n*, 979 F.2d 721, 723–24 (9th Cir.1992); *Bridgeport Guardians, Inc. v. City of Bridgeport*, 933 F.2d 1140, 1144 (2d Cir.1991). Had the Department rejected such a proposal after it was found to reduce adverse impact while still yielding qualified candidates for promotion, the Department would have faced a very real prospect of liability under Title VII for using an employment practice that adversely impacted minorities.

Therefore, when the Department learned that its proposed promotion scheme of hiring 30 officers in strict rank order resulted in a black/non-black selection percentage ratio of 20%, well below the 80% rule of thumb set by the four-fifths rule, it had a sufficient evidentiary basis, in light of the Department's past discrimination against blacks, to take remedial action.

13. A "chi-square" statistic indicates as a percentage the likelihood that the difference between two measures—in this case, between the selection percentages of blacks and non-blacks—is attributable to chance. A chi-square statistic of less than five percent is considered to indicate statistical significance, or that the difference between the two measures is attributable to something other than chance. A "Fisher's Exact Test" value expresses differences between two measures in terms of standard deviation units. A Fisher's Exact Test value of 2.00 or greater is generally considered to indicate statistical significance. Rutkowski Aff. Ex. 15 ¶ 8. Under both of these tests, the adverse impact of the 1996

tabs 1–3 (Expert Report of Kathleen K. Lundquist). Rutkowski Supp. Aff. Ex. A ¶¶ 10, 13–14 (Supplemental Expert Report of Kathleen K. Lundquist) [Docket No. 133]. These calculations bolster the inference raised by violation of the four-fifths rule that the 1996 exam adversely impacted black officers.

The City also submits the report of Dr. James Medoff, a professor of labor economics at Harvard University. Dr. Medoff reports on the state of black representation at the rank of sergeant relative to black representation at the officer level. He states that, as of October 1996, 25.02% of the 1547 police officers within the Department were black, but only 16.49% of the 285 sergeants were black. Rutkowski Aff. Ex. 14 ¶ 14 & tbl.1 (Expert Report of James Medoff). This difference is statistically significant using a chi-square statistic. *Id.* The gap diminishes, but remains, when officers not eligible for promotion by virtue of not having served long enough on the force are excluded from the calculation. *Id.* ¶ 15 & tbl.2. The court in *Superior Officers* found similar evidence relevant to the question whether the Department had remedied past discrimination adequately, and held that the paucity of black officers at the lieutenant level reinforced the Department's evidentiary foundation for its race-conscious action. 147 F.3d at 21.

The Court is therefore satisfied from this undisputed evidence that the City has satisfied its burden of showing that the Department had a "strong basis in evidence" for taking remedial action. *See Wygant,* 476 U.S. at 292, 106 S.Ct. 1842 (O'Connor, J., concurring) (suggesting that "demonstrable evidence of a disparity" between the percentage of minorities in a government position and the percentage of qualified minorities in the relevant labor pool "sufficient to support a prima facie

exam on blacks vis-a-vis non-blacks was

Title VII pattern or practice claim" by minorities would constitute a strong basis in evidence for remedial action); *cf. Shaw v. Hunt,* 517 U.S. at 908 n. 4, 116 S.Ct. 1894 (assuming that a state has a compelling interest in complying with the Voting Rights Act, but only when the government has a "strong basis in evidence for believing that it is violating the Act") (citations omitted). The Court holds that, in this case, the City's interest in remedying past discrimination is supported by a sufficiently substantial evidentiary basis that it rises to the level of a compelling state interest.

#### c. Avoiding Litigation

The third justification submitted in support of the Department's promotion decisions is the Department's interest in avoiding litigation that it asserts would have followed inexorably from its failure to promote more than one black officer to the rank of sergeant. City's Mem. at 17–18; Evans Aff. ¶¶ 6, 10–11. In support of its argument, the City relies upon *Superior Officers,* where the First Circuit stated that the motivation of "heading off a potential discrimination claim—would be [a] lawful" justification for race-conscious action. 147 F.3d at 23.

To say that the desire to avoid litigation is a *lawful* objective does not necessarily make it a *compelling* objective in the constitutional sense. The cases upon which the First Circuit in *Superior Officers* and the City rely involve Title VII claims brought by disgruntled employees as a result of an employer's decision to promote a member of another race or gender in order to fulfill a pre-existing settlement agreement or consent decree between the employer and the promoted individual. *Marcantel v. La. Dep't of Transp. & Dev.,* 37 F.3d 197, 198 (5th Cir.1994); *Carey v. United States Postal Serv.,* 812 F.2d 621,

found to be highly statistically significant. *Id.*

622–23 (10th Cir.1987); *EEOC v. McCall Printing Corp.*, 633 F.2d 1232, 1234–35 (6th Cir.1980). These cases stand only for the proposition that when an employer hires or promotes an individual on the basis of race or gender in order to fulfill a pre-existing settlement agreement or consent decree with that individual, the employment decision does not constitute unlawful discrimination against others who were not a part of the settlement agreement or consent decree. *Marcantel*, 37 F.3d at 201; *Carey*, 812 F.2d at 624; *McCall Printing*, 633 F.2d at 1237.

 Here, there was no consent decree in force between the Department and the Black Officers that required them to be promoted to sergeant at the next available opportunity. The interest articulated by the City in this case is much more ephemeral: it is a belief that, even though no consent decree existed between the Department and MAMLEO or the Black Officers, there was the prospect of a Title VII suit brought by one of these parties had the Department promoted in strict rank order.

The general assertion of an interest in avoiding litigation, without more, "sweeps too broadly" to be a compelling state interest in all circumstances. *Shaw v. Hunt*, 517 U.S. at 908 n. 4, 116 S.Ct. 1894. Certainly there cannot be a compelling state interest in "avoiding meritless lawsuits." *Id.; see also id.* at 943 n. 18, 116 S.Ct. 1894 (Stevens, J., dissenting) ("[T]he majority is surely correct in stating that the threat of a lawsuit, however unlikely to succeed, does not constitute a compelling interest . . . ."). Thus, this Court does not read the language of the First Circuit in *Superior Officers* to mean that a conclusory assertion by a defendant that failing to act in a race-based way would have invited litigation suffices to establish a compelling interest.

Instead, the proper way to analyze an articulated interest in averting a lawsuit under strict scrutiny is the same as an articulated interest in remedying past discrimination: the interest is compelling only if a defendant has a "strong basis in evidence" for believing it violated the relevant law that would have brought about the feared lawsuit. *Shaw v. Hunt*, 517 U.S. at 908 n. 4, 116 S.Ct. 1894. In this case, only if the Department had a strong basis in evidence for believing it violated Title VII would the City's interest in avoiding a lawsuit predicated on a violation of Title VII rise to the level of a compelling interest.

The analysis here is thus entirely duplicative of the Court's consideration of the City's interest in remedying past discrimination, *see supra* Part IV.B.1.b & note 12, and the Court will not repeat it. Although the City cannot get by with a bald assertion that a lawsuit would have followed from proceeding in strict rank order, together with MAMLEO it has shown here that a meritorious Title VII action was likely given the solid evidence of the disparate impact of the 1996 exam, the history of discrimination within the Department, and the close watch kept by MAMLEO over all hiring and promotion decisions made by the Department. The Court holds this interest to be compelling based on the undisputed facts of this case.

### 2. Narrow Tailoring

The City and MAMLEO assert that the promotion decisions at issue were narrowly tailored—as they must be under a strict scrutiny analysis—to further the compelling interests set out above. The Plaintiffs, not surprisingly, contest this conclusion. Pls.' Opp'n to City's Mem. at 17–19; Pls.' Opp'n to MAMLEO's Mem. at 9–10. It is for this Court to determine, by applying the law to the undisputed facts as

presented by the parties, whether the Department's promotion decisions were narrowly tailored. *See, e.g., United States v. Sec'y of Hous. & Urban Dev.*, 239 F.3d 211, 219 n. 12 (2d Cir.2001) ("A district court's determination that a race-conscious remedy is narrowly tailored to advance a compelling government interest involves an application of law to facts . . . ."); *Eng'g Contractors Ass'n of S. Fla., Inc. v. Metro. Dade County*, 122 F.3d 895, 905 (11th Cir. 1997) ("After identifying the factual predicate for the affirmative action program in question, the district court makes a legal determination about whether the program's terms are sufficiently tied to its legitimate goals to pass constitutional muster."). Before addressing the dispute between the parties, the Court maps out the legal landscape upon which narrow tailoring battles are fought.

■ The Supreme Court and the First Circuit have provided several criteria to direct lower courts in evaluating race-conscious policies. The Supreme Court has stated that factors to be considered include "the necessity for the relief and the efficacy of alternative remedies; the flexibility and duration of the relief . . . and the impact of the relief on the rights of third parties." *United States v. Paradise*, 480 U.S. 149, 171, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987) (plurality opinion). The First Circuit provided further guidance in *Mackin v. City of Boston*, 969 F.2d 1273 (1st Cir.1992), where it stated that relevant narrow tailoring factors include:

> [T]he extent to which (i) the beneficiaries of the order are specially advantaged, (ii) the legitimate expectancies of others are frustrated or encumbered, (iii) the order interferes with other valid state or local policies, and (iv) the order contains (or fails to contain) built-in mechanisms which will, if time and events warrant, shrink its scope and limit its duration.

*Id.* at 1278; *see also Superior Officers*, 147 F.3d at 23–25 (applying *Mackin* factors and holding that promotion of one Hispanic officer to the rank of lieutenant out of rank order was narrowly tailored to remedying past discrimination committed by the Department). The Court analyzes the Department's promotion decisions using these factors.

■ The first consideration under narrow tailoring is "the necessity for the relief and the efficacy of race-neutral alternatives." *Paradise*, 480 U.S. at 171, 107 S.Ct. 1053. It is clear in this case that *some* kind of relief was necessary, in light of the fact that promoting 30 officers in strict rank order as the Department originally planned would have adversely impacted black officers and exposed the Department to suit from those officers or from MAMLEO, which closely reviewed the Department's actions. *See supra* Part IV.B.1.b & note 12; Callahan Aff. ¶¶ 9–11; Evans Aff. ¶¶ 4–11. The Department's response was to promote only enough black officers to bring it into compliance with the four-fifths rule and avoid an inference of adverse impact. *See* Callahan Aff. Ex. B (comparing black/non-black selection percentage ratios for four different promotion arrangements). According to Dr. Kathleen Lundquist, the approach taken by the Department represented the alternative that had the least adverse impact on white officers, with the exception of an approach proposed by the Department that was rejected by the Division. Rutkowski Aff. Ex. 15 ¶¶ 13–14 & tab 3. This undisputed evidence suggests that the Department did what was necessary, and no more, to correct the adverse impact of the 1996 exam.

As to the efficacy of race-neutral alternatives, this case is slightly different from *Superior Officers*, where there was "no suggestion that any race-neutral measure would have been adequate to remedy the

[Department]'s past discrimination." 147 F.3d at 25. Here, the Plaintiffs argue that at least two possibilities—adding an oral interview component to a candidate's promotion score in order to mitigate the adverse impact of the 1996 exam, and adding an "assessment center" [14] component to a candidate's promotion score—could have been implemented by the Department to avoid adverse impact in a less race-conscious way. Pls.' Opp'n to City's Mem. at 18.

The Court is not sure that these alternatives would even have been feasible alternatives to the promotion decisions made by the Department. The Department learned of the adverse impact of the 1996 exam only after it received a certified list of passing scores from the Division. Callahan Aff. ¶¶ 8–9, 11. It is doubtful that the Department would have been at liberty, at that late stage, to scrap the 1996 exam altogether and add new components, such as an oral interview, to the process by which it chose new sergeants.

The Court is quite sure, however, that these alternatives would have been much more cumbersome and much less certain to achieve remediation of the adverse impact of the 1996 exam than the promotion decisions that were ultimately made. Edward Callahan testified at a deposition that the reason oral interviews were omitted from the 1996 exam was because "the expense was enormous," and because such interviews did not successfully avert litigation. Callahan Dep. at 119 (dated Sept. 21, 2000). Although similar observations about "assessment centers" are not readily apparent from the record, it is reasonable to assume that such tests—simulations of

real-world sergeant duties—would be similarly costly, and would not necessarily yield as immediate a reduction in adverse impact as did the promotion decisions at issue in this litigation.

The next consideration in narrow tailoring analysis is the extent to which "the beneficiaries of the [race-based decision] are specially advantaged." *Mackin*, 969 F.2d at 1278. In *Superior Officers*, the First Circuit applied this facet of narrow tailoring:

> Ruiz ... was not "specially," or unfairly benefitted by his promotion. Ruiz's performance on the 1992 exam was not only passing, but only one point shy of that of the candidates bypassed for his promotion. In *Stuart* [*v. Roache*, 951 F.2d 446, 449 (1st Cir.1991) ], by comparison, we approved the remedial promotion of candidates from below the "certification" cut-off of "2n + 1" candidates, a far greater gap in scores.

147 F.3d at 24. Here, there was no gap between the Black Officers and the Plaintiffs in test score. If the beneficiary of the race-conscious action in *Superior Officers* was found not to have been unfairly rewarded by the promotion decision, then *a fortiori* the Black Officers in this case, who scored identically on the 1996 exam to the Plaintiffs, have not been unfairly benefitted.

 Another important factor in the narrow tailoring equation is the degree to which the race-conscious action interferes with the rights, interests, and expectations of third parties. *Paradise*, 480 U.S. at 171, 107 S.Ct. 1053; *Mackin*, 969 F.2d at 1278. In this case, the ten officers who

---

**14.** An "assessment center" is a test or simulation designed to examine how well a candidate fulfills a certain skill set required of the job sought. As Commissioner Evans explained, "[t]here can be assessment centers that will access [sic] how an individual handles paperwork. There can be assessment centers where an individual will be given a scenario in how he would respond in the scenario." Freidel Aff. Ex. 2, at 7 (Deposition of Paul F. Evans, day two).

also scored 84 but who were not promoted could arguably be said to have had their interests and expectations impaired by the promotion decisions. Several factors, however, mitigate the force of this argument. First, the burden borne here by the Plaintiffs lay in being passed over for promotion, rather than, for example, being laid off. The Supreme Court has recognized that "[d]enial of a future employment opportunity is not as intrusive as loss of an existing job." *Wygant*, 476 U.S. at 282–83, 106 S.Ct. 1842. Second, in Massachusetts, civil servants do not have a property interest in promotions. *Bielawski v. Personnel Adm'r of Div. of Personnel Admin.*, 422 Mass. 459, 466, 663 N.E.2d 821 (1996) (rejecting claim that civil servant had property interest in promotion "by virtue of his name appearing on the top of the certified list, his high score, or his expectations built up over years of long service"). Third, when a civil service exam results in a tie-score, and the appointing authority (in this case, the Department) promotes some but not all of the tied candidates, no actionable "bypass" has taken place in the parlance of the Civil Service Commission. Freidel Aff. Ex. 3, at IV(a) (Civil Serv. Comm'n, *A Guide to the Civil Service Process* ) ("A bypass does not occur if one or more candidates have a tie score."); *id.* Exs. 4 & 5 (opinions of the Civil Service Commission dismissing appeals of two of the Plaintiffs in this case, William J. Dwan and William Knecht, respectively, because no bypass had taken place). Fourth, because "white officers passed over .on one test may be considered for future appointments," *Stuart v. Roache*, 951 F.2d 446, 454 (1st Cir.1991), any interference with legitimate interests is likely to be temporary. As the Plaintiffs' counsel represents, the Plaintiffs will continue to seek promotion. Pls.' Opp'n to City's Mem. at 5. Indeed, three of the Plaintiffs, Michael P. Locke, William J. Dwan, and Thomas L. Sexton, have since been promoted to sergeant. Callahan Reply Aff. ¶¶ 3, 5–6 [Docket No. 143]. While the Plaintiffs' interest in being promoted to sergeant was certainly affected by the promotion decisions, the competitive nature of Department promotions, the absence of any legal expectancy in a promotion, and the temporary nature of the imposition suggest that this consideration does not seriously impugn the narrow tailoring of the promotion decisions.

The fourth consideration in narrow tailoring analysis is the degree to which the decision "interferes with other valid state or local policies." *Mackin*, 969 F.2d at 1278. In *Superior Officers*, the court held that the promotion of one Hispanic officer out of rank order did not interfere with state or local policies, because the promotion did not interfere with basic merit principles embodied in the state civil service law. 147 F.3d at 24 ("[Ruiz's] test score indicated that he and Plaintiffs shared virtually identical qualifications."). The court in *Superior Officers* may have given this consideration somewhat short shrift, as the promotion decision at issue in that case, along with the decisions here, certainly are questionable under the state civil service law definition of basic merit principles, which includes a guarantee of "fair treatment of all applicants and employees in all aspects of personnel administration without regard to ... race." Mass. Gen. Laws ch. 31, § 1.[15]

The structure of the Massachusetts civil service law, however, suggests that the promotion decisions at issue here did not ultimately interfere with valid state policy.

---

**15.** The Court does not attempt to define precisely what the guarantee of "fair treatment" without regard to race means.

First, even though the civil service law guarantees "fair treatment" without regard to race, the Division allows appointing authorities like the Department to make bypasses on the basis of race. The Massachusetts Supreme Judicial Court recognized this in *Massachusetts Ass'n of Minority Law Enforcement Officers v. Abban*, 434 Mass. 256, 748 N.E.2d 455 (2001), when it observed:

> [T]he police department was not without options for pursuing its goals: Civil service law allows for special certifications based on race, color, national origin or sex. Personnel Administration Rules, PAR 10.... The analysis under Par 10 appeals is substantially similar to that of the strict scrutiny standard for protected classes under an equal protection claim.

*Id.* at 261 n. 12, 748 N.E.2d 455 (internal quotation marks omitted). Massachusetts civil service law thus expressly allows for the consideration of race in making bypasses, so long as such a bypass would survive strict scrutiny. But in contrast to the promotions at issue in *Abban* and *Superior Officers*, the promotion decisions here involved no bypass. Freidel Aff. Ex. 3. As such, the Plaintiffs had no basis for appealing the decision of the Department to the Civil Service Commission. *Id.* Exs. 4 & 5. These two factors suggest that the promotion decisions here did not interfere with valid state policies embedded within the state civil service law.

The final consideration under narrow tailoring is the degree to which the policy or decision is limited in scope and duration. *Paradise*, 480 U.S. at 171, 107 S.Ct. 1053; *Mackin*, 969 F.2d at 1278. Here, the decisions involved a one-time promotion of three officers to the rank of sergeant. The City and MAMLEO assert, and the Plaintiffs do not contest, that the 1996 exam has not again been used since the promotions at issue here, Callahan Aff. ¶ 16, that a new exam has replaced the 1996 exam, *id.* ¶ 17, and that all promotions since the ones at issue here have been made in strict rank order, except for bypasses for cause, Evans Aff. ¶ 13. The remedy for the discriminatory impact of the 1996 exam thus appears to have ended as soon as the promotions were made, or at the latest when the Department abandoned the 1996 exam.

Based on the undisputed facts presented by the parties, the Court concludes that the Department's promotion decisions were narrowly tailored to remedy past discrimination and avoid a Title VII lawsuit.

The Court pauses here for a moment. In determining whether a remedy is limited in duration, courts are often left to rely on the representations of the government that such remedies are limited. In *Superior Officers*, the First Circuit observed that "both the [Department] and the [Division] have represented Ruiz's promotion as a one-time remedy." 147 F.3d at 25. Clearly it was not, otherwise this litigation would never have taken place. The representations made in *Superior Officers* have thus proved unsatisfactory, as this subsequent litigation predicated on the same wrong belies them.

This Court is therefore, unfortunately, left to do what the court in *Superior Officers* did: again warn the Department that this opinion should in no way be taken as carte blanche to engage in race-conscious action in the future. In each subsequent round of litigation, the Department must show not only that it has a strong basis in evidence for its conclusion that current vestiges of past discrimination remain and warrant a remedy, but also that the particular remedy chosen by the Department is narrowly tailored to further such an interest. As the Supreme Court has said:

> [B]ecause racial characteristics so seldom provide a relevant basis for disparate treatment, and because classifica-

tions based on race are potentially so harmful to the entire body politic, it is especially important that the reasons for any such classification be clearly identified and unquestionably legitimate .... [R]acial classifications are simply too pernicious to permit any but the most exact connection between justification and classification.

*Adarand,* 515 U.S. at 236, 115 S.Ct. 2097 (citation and internal quotation marks omitted).

One warning should have been enough. In these circumstances, it is altogether fitting and proper to borrow a doctrine from the law of trusts and estates. The City, through its Police Department and Police Commissioner, embraces an essential public trust, vital to the functioning of a modern, heterogeneous, and vibrant urban metropolis—the effective, even-handed enforcement of the laws to the end that public safety and domestic tranquility may be assured. Indeed, upon the proper discharge of this public trust depend all the other governmental functions of the City. At the same time, in the area of race relations, the Commissioner is between a rock and a hard place. The Commonwealth's civil service law eschews any form of affirmative action, yet the Commissioner believes that, on occasion, such race-conscious action furthers the direct operational needs of the Department. MAMLEO properly is alert to advance the interests of its members yet, if the Commissioner utilizes race as a criterion for hiring and promotion, those who consider themselves "white" are almost sure to sue. Then too,

the overarching legal-factual matrix is fluid and evolving.

Where there are similarly difficult issues involving the interpretation of wills and trusts in light of changed circumstances, executors, administrators, and trustees are encouraged to petition the courts for instruction. *See, e.g., Hill v. Moors,* 224 Mass. 163, 165, 112 N.E. 641 (1916); Restatement (Second) of Trusts § 259 (1959); 3A Austin Wakeman Scott & William Franklin Fratcher, *The Law of Trusts* § 259 (4th ed.1988); 4A *id.* § 394. The entire cy pres doctrine has grown out of such petitions. *See, e.g., Town of Milton v. Attorney Gen.,* 314 Mass. 234, 49 N.E.2d 909 (1943); *Jackson v. Phillips,* 96 Mass. (14 Allen) 539 (1867).

Such a procedure ought to work well here, promptly adjudicating the rights of affected parties, subject to review, and providing clear guidance in difficult circumstances to the prime decision makers.

Accordingly, this Court will retain jurisdiction post judgment, and directs the City, whenever the Department seeks to use racial factors in hiring or promotion decisions,[16] to formulate its personnel decision and then petition the Court for instructions concerning whether such a racially motivated decision passes constitutional muster. The Department shall so petition this Court both when it "reaches down" to hire or promote a lower-scoring individual on the basis of race, and when it picks among candidates who are tied on a civil service exam on the basis of race. On its part, the Court will give notice to all affected

---

**16.** Nothing herein shall be read to require any such petition concerning the Commissioner's deployment of the Department's resources or in any respect assigning officers to particular duties. The Court appreciates the delicate position the Department is in with regard to these matters, *Wygant,* 476 U.S. at 291, 106 S.Ct. 1842 (O'Connor, J., concurring), and does not wish to intervene in the Department's affairs any more than is necessary to ensure the Department's compliance with the Constitution. This procedure is reserved solely for actual hiring or promotional decisions which the Department seeks to make on racial grounds.

parties, including MAMLEO, and promptly will hold a hearing, entertain argument, and render a decision. Done properly, such a procedure ought further predictability, hold down the burgeoning legal costs of this sort of litigation, and, most important, further the general societal acceptance of the required nuanced balancing.

## V. Conclusion

For the sake of clarity, the Court summarizes the substance of its decision:

1. The Plaintiffs have standing to litigate this case because, as a result of the Department's promotion decisions, they were denied an opportunity to compete on an equal footing with other officers on the basis of race.

2. The Plaintiffs have standing to pursue injunctive relief, as they face a real and immediate threat that their right to compete on an equal footing will be denied again in the future.

3. The Department took account of race in promoting the Black Officers who scored 84 on the 1996 exam, while declining to promote the Plaintiffs, who also scored 84 and who are white.

4. The Department's promotion decisions are therefore subject to strict scrutiny, which requires that the decisions be supported by a compelling interest and that they be narrowly tailored to further that interest.

5. The Department's stated interest in effectuating its operational needs by maintaining a diverse workforce is not a compelling interest. It is too amorphous and too indefinite in scope and duration, and it risks engendering a politics of racial hostility within the Department and the City.

6. The Department's stated interests in remedying the current vestiges of past discrimination, and in avoiding a Title VII lawsuit, are compelling interests. On this record, the City has satisfied its evidentiary burden of demonstrating a "strong basis in evidence" for its claim that current vestiges of past discrimination remained within the Department, including the adverse impact of the 1996 exam that rendered the Department vulnerable to a meritorious Title VII suit by MAMLEO or minority officers, and warranted a race-conscious remedy.

7. The Department's promotion decisions were narrowly tailored to further these compelling interests. The promotion decisions did no more than what was necessary to remedy current vestiges of past discrimination and avoid a lawsuit. The record shows no credible alternatives to the promotion decisions that would have been less race-conscious. The promotion decisions elevated three qualified officers to the rank of sergeant at the expense of ten officers, including the Plaintiffs, who, although qualified, had no right or entitlement to be promoted. The promotion decisions were a one-time remedy designed to solve a discrete yet serious harm, and to do so in as narrow a way as possible.

8. The City shall petition this Court for instructions when the Department in the future chooses to use racial factors in hiring and promotions.

For these reasons, the Plaintiffs' motion for summary judgment [Docket No. 124] is DENIED, and the motions of MAMLEO and the City for summary judgment [Docket Nos. 87, 91] are ALLOWED. Judgment shall enter for the Defendants.

The Court will retain jurisdiction as noted above.

SO ORDERED.